**RICH PRODUCTS CORP., Plaintiff,**

v.

**KEMUTEC, INC., Defendant.**

No. 95–C–968.

United States District Court,
E.D. Wisconsin.

Aug. 30, 1999.

938

Frank L. Steeves, Crivello, Carlson, Mentkowski & Steeves, Milwaukee, WI, Michael B. Powers, Preston L. Zarlock, Michael J. Berchou, Phillips, Lytle Hitchcock, Blaine & Huber, Buffalo, NY, for plaintiff.

William H. Levit, Jr., Godfrey & Kahn, Milwaukee, WI, Joseph M. Nicks, Godfrey & Kahn, Green Bay, WI, for defendant.

## DECISION AND ORDER

RANDA, District Judge.

This matter comes before the Court on a variety of motions, both dispositive and non-dispositive. The case involves the alleged failure of a mechanical conveyor purchased by Rich Products Corporation ("RPC") from Kemutec, Inc. ("Kemutec"). The Court's decision sets forth the disputed and undisputed facts developed to date and resolves each motion based on those facts. To summarize the important points, the Court dismisses RPC's tort claims on economic loss grounds, allows RPC's breach of warranty claims to go forward,

allows Kemutec to rejoin Floveyor International, Ltd. ("Floveyor") for purposes of a contractual indemnification claim, and allows RPC to add Kemutec's insurer as a defendant to this action.

# I

## A. The Principals

RPC is a Delaware corporation with its principal place of business located in Buffalo, New York. (RPC's Proposed Findings of Fact ("PFOF") at ¶ 1; Kemutec's Response to RPC's Proposed Findings of Fact ("DR") at ¶ 1.) RPC has numerous plants located throughout the United States and elsewhere, including a plant in Appleton, Wisconsin. (Kemutec's Proposed Findings of Fact ("DFOF") at ¶ 2; RPC's Response to Kemutec's Proposed Findings of Fact ("PR") at ¶ 2.) RPC is primarily engaged in the manufacture of food products.

Production Machinery Co. ("PMC") is an Australian corporation which designs, manufactures and sells aero-mechanical conveyors in Australia, Asia, New Zealand and South Africa, primarily through separate distributors. (DFOF at ¶¶ 9–10; PR at ¶¶ 9–10.) PMC is not a party to this action.

Floveyor is a corporation organized and existing under the laws of England with its principal place of business located in Blaydon–on–Tyne, United Kingdom. (DFOF at ¶ 7; PR at ¶ 7.) Floveyor's principal business is the manufacture and sale of Floveyor aero-mechanical conveyors, which are sold throughout the world. (DFOF at ¶ 8; PR at ¶ 8.) Floveyor is a former defendant to this action.

Kemutec is a Pennsylvania corporation with its principal place of business located in Bristol, Pennsylvania. (DFOF at ¶ 3; PR at ¶ 3.) Kemutec is a distributor of various materials-handling equipment and products. (DFOF at ¶ 4; PR at ¶ 4.) Kemutec is currently the only defendant remaining in this action.

Advanced Industrial Design, Inc. ("AID") is an Illinois corporation with its principal place of business in Arlington Heights, Illinois. (DFOF at ¶ 5; PR at ¶ 5.) AID is primarily engaged, either as a distributor's or manufacturer's representative or agent, in the sale of industrial and materials-handling equipment. (DFOF at ¶ 6; PR at ¶ 6.) AID is a former defendant to this action.

## B. Development and Distribution of the Floveyor Conveyor

In approximately 1960, PMC designed and patented an aero-mechanical conveyor which, at least since 1981, has been fabricated and assembled by Floveyor in the United Kingdom and has been called the Floveyor Conveyor. (DFOF at ¶¶ 13–14; PR at ¶¶ 13–14.) Floveyor purchases certain components from PMC (or its nominees) for the conveyor, including rope assemblies and steel sprockets. (DFOF at ¶ 15; PR at ¶ 15.) PMC and/or Floveyor have sold the Floveyor Conveyor to commercial bakeries/food processing companies throughout the world since its introduction in the early 1960's, including sales in the United States, the Philippines, Australia, Asia and the United Kingdom. (DFOF at ¶¶ 16–17; PR at ¶¶ 16–17.) Prior to 1991 and for at least part of 1992, Floveyor distributed conveyors in the United States through a company called Orthos, Inc. ("Orthos") and Kemutec distributed a competing conveyor manufactured by a company called Enticon. (DFOF at ¶¶ 19–23; PR at ¶¶ 19–23.)

In February, 1992, after losing the Enticon business, Kemutec entered into an "Exclusive Distributorship Agreement" ("EDA") with Floveyor for the sale and distribution of Floveyor Conveyors in the Continental United States, Canada and Mexico ("the Territory"). (Id.; Nicks Aff, Att. Tab No. 32 ("EDA") at i.) Under the terms of the EDA, Kemutec was appointed the sole and exclusive distributor of Floveyor Conveyors in the Territory and promised to use its "best endeavors" to market the Conveyor, which "endeavors" included (without limitation) "direct selling through [Kemutec's] network of independent manu-

facturer's [r]epresentatives." (Nicks Aff., Att. Tab No. 32 at ¶¶ 1, 7.) Kemutec also agreed to promote the Conveyor within the Territory at · its own expense "by means of advertising, sales literature, press releases, direct mail and exhibitions." (Id. at ¶ 7(d).) Floveyor agreed to provide Kemutec with "reasonable amounts of sales literature free of charge ... and provide any marketing information it may consider useful...." (Id. at ¶ 7(h).)

Floveyor "guaranteed" the "materials and workmanship" on all equipment manufactured by Floveyor and sent to Kemutec for a period of 12 months "from the date of despatch from [Kemutec]." (Id. at ¶ 15(a).) The guarantee did not extend to "parts subject to high wear, *including ropes*." (Id. at ¶ 15(b)(i).) Floveyor also agreed to indemnify Kemutec for certain costs and legal damages related to the sale or use of the Conveyor:

(a) [Floveyor] shall indemnify [Kemutec] against all costs and damages (including Lawyers fees) awarded by a Court of Law having jurisdiction over [Kemutec] which may arise out of the selling, use or maintenance of the Products or parts therefor which have been manufactured for or by [Floveyor] and used according to its design specification where the Products cause financial loss, damage to property or death or injury to persons.

(b) [Floveyor] shall indemnify [Kemutec] against all actions and claims which might arise under this Agreement which are the result of negligent or wilfully wrong acts on behalf of [Floveyor] by its employees or agents.

(c) [Floveyor] shall take out and keep in force property insurance in the sum of $3,000,000 (three million dollars) in respect of its responsibilities and obligations in respect of sub-clauses

(a), and (b) above. It is hereby agreed and declared that under no circumstances shall [Floveyor] be required to indemnify or reimburse [Kemutec] save as set out in subClauses (a) and (b) above, and that [Floveyor's] total liability thereunder shall not exceed $3,000,000.

(Id. at ¶¶ 17(a)–(c).) Kemutec, in turn, agreed to indemnify Floveyor against all claims stemming from a "faulty application" of the Conveyor:

(d) Save where the application has been specifically recommended or warranted in writing by [Floveyor] [Kemutec] will assume responsibility for the proper application of the Product and indemnify [Floveyor] against all claims for loss, damage and costs arising in relation to the faulty application of the Product by [Kemutec].

(Id. at ¶ 17(d).) [1]

In 1988, roughly four years prior to its agreement with Floveyor, Kemutec entered a Sales Representative Agreement ("SRA") with AID. (DFOF at ¶ 26; PR at ¶ 26.) Under the terms of the SRA, AID was appointed Kemutec's "exclusive representative" for the sale of certain designated products—eventually including the Floveyor Conveyor—within a territory that included Appleton, Wisconsin. (PFOF at ¶ 4; DR at ¶ 4; Nicks Aff, Att. Tab No. 47 at ¶ 1.) The SRA designated AID as an "independent contractor" and expressly rejected any consideration of AID as Kemutec's "legal agent":

4. *Relationship of Company and Agent.* Neither [AID] nor any subagent thereof nor any employee of [AID] or any such sub-agent shall be considered to be a legal agent of [Kemutec] in any respect but all of the foregoing shall be considered to be independent contractors. Accordingly, neither [AID] nor any sub-agent nor any employee of

---

1. As an aside, the EDA also provided that it would be "governed by and interpreted according to the Laws of England" and that

"[b]oth parties hereto agree to submit to the jurisdiction of the English Courts." (Id. at ¶ 26.)

either shall have any right, power or authority to (and shall not) create or incur any liability or obligation with respect to [Kemutec].

(Nicks Aff., Att. Tab No. 47 ("SRA") at ¶ 4.) [2]

AID was authorized to pass information to potential customers and to issue quotations on Kemutec's behalf, and was also authorized to receive purchase orders from customers on Kemutec's behalf, but the SRA expressly required AID to "use [its] best efforts to ensure that all sales are made only upon [Kemutec's] current terms of sale." (PFOF at ¶¶ 9–13; DR at ¶¶ 9–13; SRA at ¶ 5.) AID was not to "make or transmit any quotation or proposal to a customer ... unless [Kemutec's] current terms of sale [were] incorporated in such quotation or proposal...." (SRA at ¶ 5.) This is critical, because Kemutec's standard terms and conditions protected Kemutec from a variety of claims and liability. That is, they (1) contained an express warranty guaranteeing Kemutec's equipment against defects in materials and workmanship for a period of one year from the date of shipment; (2) limited Kemutec's liability and the customer's remedies under said warranty to repair and/or replacement of the equipment at Kemutec's expense; (3) disclaimed any liability for consequential damages caused by a defect in the equipment; (4) disclaimed all other warranties, express or implied, including the implied warranties of merchantability and fitness for a particular purpose; and (5) waived the customer's right to make any claim for damages against Kemutec on theories of negligence or strict liability relating to damage caused by the equipment or Kemutec's negligence. (Nicks Aff., Att. Tab No. 51; DFOF at ¶ 29; PR at ¶ 29.) Even where AID received purchase orders from customers that contained countervailing terms and conditions, AID agreed to "specifically inform customers that all orders for Products taken by [AID] [were] subject to final acceptance by [Kemutec]." (Id.)

### C. RPC's Purchase of a Floveyor Conveyor

RPC and Kemutec were not strangers to each other, either prior to or after the events giving rise to this lawsuit. During the years 1988 through 1998, there were 35 transactions of varying size between the two companies, at least 17 of which preceded RPC's 1993 purchase of a Floveyor Conveyor. (Kemutec's Proposed Additional Findings of Fact ("DAFOF") at ¶¶ 1–2; RPC's Response to Kemutec's Additional Proposed Findings of Fact ("PAR") at ¶¶ 1–2.) The vast majority of the latter transactions—16 to be exact—involved purchases by RPC of isolated spare parts for existing machinery, with dollar amounts averaging in the hundreds of dollars. (Johnson Aff., Exs. C–R.) A review of the records for these 16 smaller purchases indicates that each order (with one exception—*see* Johnson Aff., Ex. K) was placed by RPC orally, over the phone, with no subsequent purchase order being issued. (Johnson Aff., Exs C–J, L–R.) Though less clear, it also appears that Kemutec sent an invoice along with each shipment of product, each containing Kemutec's standard terms and conditions on the reverse side. (Johnson Aff., Exs. C–R.)

One of the 17 prior transactions was more substantial than the others. In late 1987, Jeff Sage ("Sage") of RPC called Kemutec inquiring about a centrifugal sifter. (Johnson Aff, Ex. B.) On November 16, 1987, Kemutec issued a "standard quotation" listing four possible options, at prices ranging from $10,000 to $21,000, and stating that "[a]ll prices are subject to

2. There is testimony and correspondence in which Kemutec employees refer to AID as Kemutec's "agent," but Kemutec argues that such testimony is only a layman's casual use of the term "agent" and does not reflect or contradict the actual legal relationship between the two entities as set forth in the SRA. (*See e.g.*, Berchou Aff., Ex. F ("Lambing Dep.") at 33–34; Berchou Aff., Ex. G ("Johnson Dep.") at 34; Berchou Aff. Ex I ("Newton Dep.") at 55; Berchou Aff., Ex. A—345–346; PFOF at ¶¶ 7–8, 15; DR at ¶¶ 7–8, 15.)

our terms and conditions on the reverse side of page one of this quotation."[3] (Id.) RPC sat on the matter a while, and then decided to purchase the sifter in April of 1988. (Johnson Aff., Ex. B.) Kemutec generated an invoice dated April 29, 1998 indicating that RPC would "PICK UP" the sifter that day and making no reference to any standard terms and conditions. (Id.) RPC generated a purchase order dated May 13, 1988 purporting to be a "CONFIRMING ORDER" and containing RPC's terms and conditions on the reverse side. (Id.) It is unclear when the sifter was actually shipped or "PICK[ED] UP," but RPC ultimately issued a check to Kemutec dated June 6, 1988 for the purchase price of $10,904.00. (Id.)

In early 1993, RPC was using an auger conveyor to move food components in its blending room at the Appleton, Wisconsin plant. (DFOF at ¶ 39; PR at ¶ 39; PFOF at ¶ 16; DR at ¶ 16.) However, the auger was coming into contact with its casing, creating the potential for metal fragments to sheer off the machine and contaminate RPC's food components.[4] (Complaint at ¶¶ 8–9; DFOF at ¶ 39; PR at ¶ 39.) As a result, RPC began looking for equipment to replace the auger conveyor. (DFOF at ¶ 40; PR at ¶ 40.) Jeff Sage, a project engineer for RPC, was assigned responsibility to find a replacement for the conveyor. (DFOF at ¶ 41; PR at ¶ 41.) Sage saw an advertisement for a Floveyor Conveyor in a trade magazine. (DFOF at ¶ 43; PR at ¶ 43.) He did not keep a copy of the actual ad, but Sage confirmed that it was similar to two ads shown to him during his deposition in this matter. (Id.; see also, Nicks Aff., Att. Tab Nos. 34–35.) Those ads state that the Floveyor Conveyor "moves mountains of almost anything," listing a number of materials including "food" and "fine powders," and also listing Kemutec as the contact for further information. (Nicks Aff., Att. Tab Nos. 34–35.)

After seeing the Floveyor ad, Sage contacted Ron Hajek of AID.[5] (DFOF at ¶ 45; PR at ¶ 45.) During that phone conversation and/or in a subsequent face-to-face meeting at RPC's Appleton plant, Sage and Hajek discussed RPC's specific blending room application, i.e., a conveyor that could move a mix of flour, salt, sugar and baking soda at a continuous rate of 13,500 pounds an hour, discharged onto the conveyor from a horizontal sifter at a height of 29 inches and transported up to a height of roughly 10 or 11 feet. (Nicks Aff., Tab No. 11 ("Hajek Dep.") at 133–136; Sage Dep. at 54–61.) Hajek made notes of these requirements, and also sketched a diagram of the described application. (Hajek Dep. at 132–133; Nicks Aff., Tab No. 20.) While neither Sage nor Hajek have strong recollections of what else was said during these conversations, they both remember that Sage asked Hajek if Floveyor Conveyors were used in the food industry and that Hajek responded that they were, or at least that they were "used in

---

**3.** The file produced for this transaction does not contain an actual photocopy of the standard terms and conditions purportedly contained on the reverse side of the quotation. (Id.) This stands in contrast to the other 16 files, which contained copies of the standard terms and conditions. (Johnson Aff., Exs. C–R.)

**4.** Such concerns were not new to the Appleton plant. As early as 1980, RPC employees discovered that stainless steel fragments of certain sizes or dimensions within food components produced by RPC could, under certain circumstances, pass undetected by standard metal detectors put in place to detect such contamination. (Nicks Aff., Tab No. 9 ("Eggert Dep.") at 69–71.) In 1992, Jeff Sage

of RPC proposed that the Company purchase an x-ray metal detection machine, explaining that "[t]he addition of such a unit to our production equipment would give us plant wide tramp metal protection in all of our products," "improve customer confidence," and "greatly reduce exposure to the liability of product contamination in our facility." (Nicks Aff., Att. Tab No. 53; emphasis in original.) Management at the Appleton plant recommended the purchase, but the proposal was rejected by RPC's corporate office in Buffalo. (DFOF at ¶ 38; PR at ¶ 38.)

**5.** Apparently the ad viewed by Sage referred him to AID in addition to, or instead of, Kemutec.

the bakery industry ... and this [was] a bakery formula." (Hajek Dep. at 135; Sage at 59–60.) Sage further remembers asking Hajek about the track record of Floveyor Conveyors, and Hajek responding that, to the best of his knowledge, there were no problems with the Conveyor.[6] (Sage Dep. at 60.) Sage also claims Hajek gave him a "tear sheet" or "color brochure" containing "a brief description of the uses for the piece of equipment." (Sage Dep. at 57–58.) As best Sage could remember, the tear sheet included pages of a brochure stating that the Floveyor Conveyor "[h]andles almost anything ...," followed by a list of materials including "[f]ood powders" and "[b]akeries" and also a table referencing the Conveyor's "volumetric performance" with respect to different materials. (Sage Dep. at 91–92; Nicks Aff, Att. Tab No. 36 at Bates Nos. 11,764–65.) At the close of the discussions, Hajek apparently gave Sage a verbal quote, which Sage asked Hajek to memorialize in a formal written quote for the purchase of a Floveyor Conveyor. (DFOF at ¶ 51; PR at ¶ 51; Sage Dep. at 63; Nicks Aff., Tab No. 23.)

Hajek then spoke with Mark Chalmers of Kemutec. (DFOF at ¶ 52; PR at ¶ 52.) At the time, Chalmers was the Kemutec employee responsible for quoting on the Floveyor line. (Berchou Aff., Ex. B ("Chalmers Dep.") at 22.) Either prior to or after that conversation, Hajek sent Chalmers a drawing of the proposed application, along with the specific details of the application, i.e., product mix, volume, materials, etc. (Nicks Aff., Tab Nos. 21–22; Hajek Dep. at 133, 145; PFOF at ¶ 20;

DR at ¶ 20.) Hajek testifies that Chalmers told him "he would have a quotation off as quickly as possible." (Hajek Dep. at 146.)

The quotation was not sent directly to RPC. Depending on the situation, Kemutec might send the relevant sales representative a quote which the representative would "basically retype" onto its own letterhead and present to the customer, or Kemutec might send a quote directly to the customer, or Kemutec might send a quote on its own letterhead which the representative would then present to the customer. (Chalmers Dep. at 44.) In this particular case, Kemutec employed the first approach. (Chalmers Dep. at 44–45.) Chalmers faxed Hajek a memo containing the details of the desired quotation, directing Hajek to "please quote the following."[7] (Nicks Aff., Tab No. 22.) Hajek retyped the quote virtually word-for-word onto AID letterhead. (Nicks Aff., Tab Nos. 22 & 23; Hajek Dep. at 150.) The only language Hajek added to the quote were the place of delivery ("F.O.B.: Bristol, PA"), the payment terms ("TERMS: Net 30 days"), the statement that "Kemutec/Floveyor products ... have excellent experience in handling bakery materials and products,"[8] and closing language informing RPC that "[w]e attach our descriptive bulletin which outlines this equipment." (Id.) Hajek sent the quote to Sage on February 11, 1993. (Id.; Hajek Dep. at 150.) The quote contained enough detail for RPC to decide whether or not to purchase the Conveyor, i.e., it included a price, delivery and payment terms, prod-

6. Hajek does not directly contradict Sage in this regard. While Hajek has no specific recollection of discussing the Conveyor's track record, he confirms that he told Sage it was a piece of equipment suitable for the specific application described, and he also states that he was unaware at the time of any "track record" problems that could have caused him to "put up any flags" concerning its intended use by RPC. (Hajek Dep. at 135–36.)

7. The memo instructed Hajek to quote, inter alia, a Floveyor unit of certain height and incline dimensions, constructed of 316 stain-

less steel, "designed to handle a blended mixture of flour, salt, sugar and baking soda, generally described as free flowing and having an average bulk density of 40–45 lbs. cu. ft. at a rate of 13,500 lbs per hour," consisting of various specified components including a "[r]ope assembly of 316 stainless steel wire rope," deliverable within 3–4 weeks, at a price of $11,229.00. (Nicks Aff., Tab No. 22.)

8. Hajek insists that he included this representation based on materials and bulletins AID had previously received from Kemutec and Floveyor. (Hajek Dep. at 151–52.)

uct and component specifications, and application specifications. (PFOF at ¶ 29; DR at ¶ 29; Nicks Aff., Tab No. 23.) Neither Chalmers' memo to Hajek—nor the quote Hajek copied therefrom—contained, attached, referenced or incorporated Kemutec's standard terms and conditions.[9] (PFOF at ¶ 35; DR at ¶ 35; Nicks Aff., Tab Nos. 22 & 23.)

Hearing nothing, Hajek visited RPC's Appleton plant in early March, 1993 to meet with Sage and determine the status of the quotation. (Hajek Dep. at 156–57.) Sage told Hajek that the quotation had been submitted for approval and that a purchase order would be forthcoming from RPC's headquarters in Buffalo. (Id.) On March 11, 1993, RPC issued a purchase order to AID, identifying AID as the vendor. (DFOF at ¶ 59; PR at ¶ 59; Berchou Aff., Ex. at Ex. 294; Nicks Aff., Att. Tab No. 42 ("the March 11 Purchase Order").) At the bottom of the first page, the purchase order stated it was "SUBJECT TO ACCEPTANCE OF THE 'ADDITIONAL TERMS AND CONDITIONS' ON THE REVERSE SIDE." (Berchou Aff., Ex. A at Ex. 294; Nicks Aff., Att. Tab No. 42.) On the reverse side, the purchase order stated:

> Acceptance by you ("Seller") of this Order is limited to acceptance of the following terms and conditions unless specifically waived in writing by Rich Products Corporation ("Buyer")

Seller guarantees, warrants and represents that goods shall conform to the description of same on the face side hereof and that goods shall be of merchantable quality, fit for the particular purposes of and uses of Buyer and free from defects and faulty workmanship. Any attempt by Seller to vary, in any degree, any of the terms of this offer in Seller's acceptance shall not operate as a rejection of this offer unless such variance is in the terms of the description, quantity, price, or delivery schedule, but shall be deemed a material alteration thereof and this offer shall be deemed accepted by Seller without said additional or different terms.

Any additional or different terms which may be contained in any documents furnished by the Seller are hereby objected to and rejected.

(Id.)

Hajek faxed the front page of the March 11 Purchase Order to Chalmers of Kemutec on March 15, 1993. (PFOF at ¶ 41; DR at ¶ 41; Chalmers Dep. at 99–100; Berchou Aff., Ex. K at Exs. 367–368; Hajek Dep. at 158–162.) Hajek neglected to fax the reverse side of the purchase order containing RPC's standard terms and conditions. (Id.) Though the front page of the purchase order referenced those terms and conditions, Chalmers did not question Hajek regarding the same. (Chalmers

---

**9.** As indicated above, attached to the quote was a brochure containing various information about the Floveyor Conveyor, including, *inter alia*, volumetric performance tables for transporting various materials and a statement that the Floveyor Conveyor "[h]andles almost anything ...," followed by a list of materials including "[b]akeries," "confectionery" and "food powders." (Nicks Aff., Tab No. 23.) The brochure appeared to Sage as a "repeat of the tear sheet" produced by Hajek at their initial meeting. (Sage Dep. at 93; DFOF at ¶ 48; PR at ¶ 48.) In any event, the origin of the various ads, tear sheets and brochures is a matter of some discussion by the parties. Based on the Court's review of the factual record, it is undisputed that most of the substantive content of the materials at issue was generated initially by Floveyor itself, based on manuals received from PMC. (Nicks Aff., Att. Tab Nos. 14 ("Horner Dep.") at 58–69, 28 & 48.) That is, Floveyor generated certain "bulletins" containing the information at issue and sent those "bulletins" to its various distributors, including Kemutec. (Horner Dep. at 64–65.) While Kemutec created some of its own advertisements, the information contained therein—at least the information or representations relevant to this lawsuit—came from bulletins provided by Floveyor. (Berchou Aff. Ex. I ("Newton Dep.") at 56, Ex. A at Exs. 243–244.) AID apparently received its copies of the Floveyor bulletins and/or various other materials from Kemutec—not Floveyor—and kept the same in stock, enabling Hajek to pass the materials on to Sage. (Horner Dep. at 65–66; Hajek Dep. at 150–54.)

Dep. at 99–100.) Chalmers focused instead on the fact that the purchase order referenced AID—not Kemutec—as the vendor. (Chalmers Dep. at 99–102.) Chalmers called Sage and asked him to issue a new purchase order naming Kemutec as the vendor. (DFOF at ¶ 61; PR at ¶ 61.) Kemutec sought the change to insure that it would have direct recourse against RPC for payment purposes. (Chalmers Dep. at 134–35.)

On March 15, 1993, RPC issued a new purchase order naming Kemutec as the vendor. (PFOF at ¶¶ 45–46; DR at ¶¶ 45–46; Nicks Aff., Att. Tab No. 40 ("the March 15 Purchase Order").) With the exception of the vendor name, date and purchase order number, the new purchase order was identical to the prior order, including a reference to, and inclusion of, RPC's standard terms and conditions on the reverse side. (PFOF at ¶ 47; DR at ¶ 47; Nicks Aff., Att. Tab No. 40.) Sage faxed the front page of the new purchase order to both Hajek of AID and Chalmers of Kemutec, without faxing the reverse side containing RPC's standard terms and conditions. (DFOF at ¶ 63; PR at ¶ 63; Hajek Dep. at 229–230; Nicks Aff., Att. Tab No. 43; Berchou Aff., Ex. K at Ex. 369.) Sage also mailed a full copy of the new purchase order—containing both the front and reverse sides of the order—to AID. (DFOF at ¶ 63; PR at ¶ 63; Hajek Dep. at 175, 230–231; Berchou Aff., Ex. A at Ex. 299.) Hajek is not sure when he received the full copy by mail, although AID's copy of the same is date-stamped March 22, 1993. (Hajek Dep. at 231–232; Berchou Aff., Ex. A at Ex. 299.) In any event, Hajek testified that, whenever he received the full copy of the new order, he or someone else mailed it to Kemutec, although Chalmers testified that Kemutec never received a copy of the full order. (Hajek Dep. at 175, 232; Chalmers Dep. at 114; PFOF at ¶ 52; DR at ¶ 52; DFOF at ¶ 75; PR at ¶ 75.)

On March 15, 1993, Chalmers faxed a memo to James Horner of Floveyor communicating the "[g]ood unexpected news" of RPC's order and specifying the details of the proposed application. (DFOF at ¶ 69; PR at ¶ 69; Berchou Aff., Ex. K at Ex. 16.) On March 17, 1993, Kemutec faxed a purchase order to Floveyor. (DFOF at ¶ 70; PR at ¶ 70; Nicks Aff., Att. Tab No. 29.) Kemutec also sent a letter to RPC, care of Mr. Sage, thanking him for the order and forwarding a maintenance videotape:

> As the Kemutec Product Specialist for the FLOVEYOR Aero–Mechanical Conveyors, I wish to personally thank you for you [sic] recent order of a 3″ × 12′–0″ long unit. We trust that you will be satisfied with your purchase once your unit arrives. If, in the meantime you have any questions regarding the FLOVEYOR, please feel free to contact me.
>
> Attached with this letter, please find a complimentary FLOVEYOR maintenance videotape which visually demonstrates what our instruction manual verbally describes. We trust that this videotape will assist you in extending your rope assembly's operating life.
>
> Should you have any questions or require any further assistance in this matter, please do not hesitate to contact us.

(Berchou Aff., Ex. K at Ex. 300.) That same day, Floveyor faxed an order confirmation to Kemutec. (DFOF at ¶ 71; PR at ¶ 71; Nicks Aff., Att. Tab No. 46.)

On March 18, 1993, someone at Kemutec prepared an Order Acknowledgment in response to RPC's March 15 Purchase Order. (DFOF at ¶ 72; PR at ¶ 72; Nicks Aff., Att. Tab No. 39 ("the Order Acknowledgment").) The acknowledgment stated at the bottom that it was "[s]ubject to Kemutec Terms & Conditions Attached." (Nicks Aff., Att. Tab No. 39.) The referenced attachment contained Kemutec's standard terms and conditions discussed *supra, i.e.,* disclaiming all implied warranties, limiting RPC's remedies to repair and/or replacement, disclaiming liability for consequential damages, and waiving RPC's right to make any claim for damages based on negligence or strict liability.

(Id.) There is a genuine dispute of fact, however, as to whether the acknowledgment was actually sent to RPC. Although Helen Smith of Kemutec insists that it was both her's and Kemutec's general practice to send such acknowledgments to both Kemutec's sales representative and the customer, and although it is undisputed that AID received its copy of the acknowledgment, no one from Kemutec recalls sending the acknowledgment to RPC and there is no cover letter or fax transmittal sheet evidencing such a communication. (DFOF at ¶¶ 72–73; PR at ¶¶ 72–73; PFOF at ¶¶ 81–82, 89–96; DR at ¶¶ 81–82, 89–96.) Sage claims he never received or saw a copy of the acknowledgment and no such copy has been found or produced from RPC's files. (Sage Dep. at 118–121.) Sage further claims he would have halted the transaction immediately had he received such a document because RPC purportedly never agrees to a seller's terms and conditions. (Id.) AID, for its part, confirms that it did not send a copy of the acknowledgment to RPC, did not provide RPC with Kemutec's terms and conditions, and did not otherwise inform RPC that its order was subject to Kemutec's terms and conditions. (PFOF at ¶¶ 84–86; DR at ¶¶ 84–86.) On this record, it is unclear whether the acknowledgment was actually sent to RPC.

In May, 1993 the Floveyor Conveyor was shipped directly from Floveyor's facilities in Newcastle, England to RPC's plant in Appleton, Wisconsin; it was never in Kemutec's possession. (DFOF at ¶¶ 78, 84; PR at ¶¶ 78, 84.) An instruction manual prepared by Floveyor was included in the package with the Floveyor Conveyor. (DFOF at ¶ 79; PR at ¶ 79.) The manual stated that the "only ... adjustment of any significance" was "the tension of the Rope Assembly." (DFOF at ¶ 80; PR at ¶ 80; Nicks Aff., Att. Tab No. 31 at 20.) It stated that a "TIGHT ROPE causes the discs to be grooved badly on the trailing face where the sprocket notches cut into them, strands of wire rope to break close to each disc on either side,...." (Id.) The manual was reviewed by James Endlich, maintenance planner at RPC's Appleton plant. (DFOF at ¶ 82; PR at ¶ 82.)

### D. Problems with the Conveyor's Rope Assemblies

There is substantial evidence that purchasers of Floveyor Conveyors over the years have experienced problems with damage to their wire rope assemblies. (See, Berchou Aff., Ex. A at Exs. 27–29, 33, 36–37, 40, 43–44, 48–52, 56–57, 59–60, 64–67, 74–75, 77–80, 82, 84–86, 89, 93, 105, 126–127, 132, 134, 160, 163, 317, 319–326, 328–329, 331, 334, 337–338, 340, 343.) There is some evidence that Kemutec was aware of a few of these customers and their problems prior to RPC's purchase of the Conveyor and did not disclose the same.[10] (See, Berchou Aff., Ex. A at Exs. 49–50, 52, 55, 160, 321–322, 334; Chalmers Dep. at 269–272.) There is additional evidence that Kemutec became aware of other customers and their problems after the sale to RPC and before RPC's problems arose and did not disclose that information either. (See, Berchou Aff., Ex. A at Exs. 61, 67–68, 81.) By itself, however, this evidence does not indicate the degree to which the applications involved and the problems experienced by other customers were similar to RPC's application and problems. (See, Berchou Aff., Ex. A at Exs. 27–29, 33, 36–37, 40, 43–44, 48–52, 56–57, 59–60, 64–67, 74–75, 77–80, 82, 84–86, 89, 93, 105, 126–127, 132, 134, 160, 163, 317, 319–326, 328–329, 331, 334, 337–338, 340, 343.)

### E. RPC's Product Recall

On at least two occasions prior to April, 1994, RPC found wire strands in or around its food product, though it is unclear

---

**10.** Indeed, Kemutec officials regularly requested Floveyor to provide the crimping tools and parts necessary to repair broken ropes; it even wanted to offer customers a rope repair kit, but Floveyor refused. (Chalmers Dep. at 274–75; Berchou Aff., Ex. A at Ex. 52.)

whether RPC was able to determine at the time where the wire strands came from.[11] (DFOF at ¶ 90; PR at ¶ 90.) Then, on April 2, 1994, RPC discovered that a section of the Floveyor Conveyor's wire rope was fraying. (DFOF at ¶ 91; PR at ¶ 91; Nicks Aff., Att. Tab No. 27 ("the Wallace Dep.") at 50–53.)

After discovering the problem, RPC issued a recall of all products manufactured at its Appleton plant since installation of the Floveyor Conveyor in May of 1993.[12] (DFOF at ¶ 92; PR at ¶ 92.) RPC also instructed its end-users and distributors to destroy any product that was impractical to return and apply for credit. (DFOF at ¶¶ 94–95; PR at ¶¶ 94–95.) A total of 216,904 cases of product were destroyed in the field. (Id.) A total of 195,730 cases were returned. (Id.) The returned product was tested, using x-ray metal detectors. (DFOF at ¶ 96; PR at ¶ 96.) Products cleared by the x-ray detectors were returned to inventory, unless the condition of the product or its "use by" date required that it be destroyed. (DFOF at ¶¶ 96–97; PR at ¶¶ 96–97; Nicks Aff., Att. Tab No. 6 ("Christie Dep.") at 115–116.)

In all, 29 pieces of wire were either found by RPC or returned by RPC's customers.[13] (DFOF at ¶ 101; PR at ¶ 101.) The earliest blend date for any known product in which wire was detected was February 10, 1994. (DFOF at ¶ 102; PR at ¶ 102.) RPC estimates that its out-of-pocket costs and lost profits stemming from the recall is in excess of $11 million. (DFOF at ¶¶ 103–104; PR at ¶¶ 103–104.)

## F. RPC's Lawsuit and Subsequent Settlements

RPC sued Floveyor, Kemutec and AID for damages suffered because of the alleged failure of the Floveyor Conveyor and the subsequent recall. (Nicks Aff., Att. Tab No. 1.) RPC recently settled with AID and Floveyor, leaving Kemutec as the sole remaining defendant. (DFOF at ¶¶ 105–106; PR at ¶¶ 105–106.) The settlements gave Floveyor and AID *Pierringer* releases for all unintentional tort claims and ordinary releases for all other claims. (DFOF at ¶ 107; PR at ¶ 107.) To that end, the RPC/AID settlement requires, among other things, that RPC:

… indemnify, defend and hold AID and its respective insurance carriers harmless, jointly or severally, from and against all past, present and future claims, rights, causes of action and/or demands of any type, kind or nature arising out of, in consequence of, surrounding or relating to the incidents, events or facts which gave rise to or as described in the Claims, Lawsuit and/or as described herein including those seeking contribution, indemnification, reimbursement or any other basis however denominated, including, but not limited to, the October 12, 1988 contract between Kemutec and AID, claims for any settlement, judgment, awards to or against Kemutec, Floveyor, their respective insurance carriers and/or AETNA whether brought by parties to this litigation or some other individual, corpora-

11. One piece of wire was found in cookie dough. (Nicks Aff., Att. Tab No. 33; Nicks Aff., Tab No. 12 ("Hartges Dep.") at 169–71.) Another piece was apparently found on a table or sink near the Conveyor or some other source of food product. (Nicks Aff., Att. Tab No. 55; Hartges Dep. at 161–64.)

12. It is roughly estimated that the Appleton facility produces some 6 million cases of product every year, and that each case might contain anywhere from 12 to 24 individual products. (DFOF at ¶ 93; PR at ¶ 93.)

13. It cannot be determined how many pieces might have been found in the roughly 217,000 cases of product destroyed in the field. RPC also claims there is no way of knowing how many pieces were found by customers and/or distributors but never reported. The latter statement, while theoretically true, strikes the Court as counter-intuitive: How likely is it that a customer or distributor would discover wire fragments in a piece of bakery and not report the same? While possible, it must have been a statistically insignificant occurrence. This is particularly true in the case of RPC's distributors, who were specifically warned about the possibility of such contamination and instructed to recall and return all suspected product.

tion, third party or entity including, but not limited to, AETNA. RPC's duty to defend, indemnify and hold AID and its respective insurance carriers harmless, jointly or severally, includes all Claims as defined within this Agreement and covers all Claims released under Section IV (Pierringer) and Section V (General Release). RPC's duty to indemnify, hold harmless and defend AID and its respective insurance carriers includes, but is not limited to, all claims, rights, causes of action and/or demands brought in this Lawsuit, or any other claims, rights, causes of action and/or demands whether made at the claim stage, brought in a subsequent lawsuit, or any other process of adjudication in any jurisdiction, whenever and wherever brought in the world, arising out of, in consequence of, surrounding or relating to the incidents, events or facts which gave rise to or as described in the Claims, Lawsuit and/or as described herein.

(DFOF at ¶ 105; PR at ¶ 105.) The RPC/Floveyor settlement provides, among other things, that RPC agrees:

> ... to and shall defend, indemnify and hold harmless FIL [*i.e.*, Floveyor] from and against All Claims made by any person or entity, including without limi-

tation, claims by Kemutec against FIL for contribution, indemnity and/or reimbursement whether based upon (a) the common law; (b) the Uniform Commercial Code or any other domestic or foreign statute; (c) the February 15, 1992 Exclusive Distributorship Agreement between FIL and Kemutec in respect of Floveyor Aero–Mechanical Conveyors; and/or (d) the October 12, 1988 Sales Representative Agreement by and between Kemutec and AID. It is agreed and understood that RPC's obligation to defend, indemnify and hold harmless FIL applies to actions in the Courts of the United States or of any foreign jurisdiction.

(DFOF at ¶ 108; PR at ¶ 108.)[14] Both settlement agreements expressly reserved RPC's claims against Kemutec. (DFOF at ¶¶ 105, 108–111; PR at ¶¶ 105, 108–111.)

## II

The Court deals first with the motions for summary judgment. The standards governing such motions are well established:

> Under Rule 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

14. The term "All Claims," in turn, is defined by the RPC/Floveyor Settlement Agreement to mean:

> any and all claims, warranties, actions, causes of actions, debts, dues, accounts, bonds, damages, covenants, contracts, agreements, judgments and demands, whatsoever, in law or in equity, whether or not presently known or asserted, ... arising from, relating to or based upon RPC's purchase, installation and/or use of the Floveyor including, without limitation, claims:
> - involving the design of the Floveyor, or any of its component parts;
> - alleging any manufacturing defect(s) in the Floveyor or its components parts;
> - challenging the adequacy of any warnings or instructional materials provided with the Floveyor;
> - asserting any misrepresentations, or misstatements made to RPC, or facts not disclosed to RPC, by any person or entity in

> connection with the marketing, negotiation and/or sale to RPC of the Floveyor;
> - for breach of any warranties, express or implied, made in connection with the sale of the Floveyor;
> - alleging deceptive practices or fraud in connection with the sale of the Floveyor under Section 349 of New York's General Business law or any similar statute;
> - that RPC pleaded, or could have pleaded, in any action captioned *RPC Products Corporation v. Floveyor International, Ltd., et al.*, Case No. 95–C–968, in the United States District Court for the Eastern District of Wisconsin ("the Lawsuit");
> - of a contractual or quasi-contractual nature arising from the business dealings between and among the parties to the Lawsuit concerning the Floveyor.
>
> All claims is the combination of "Unintentional Tort Claims" (defined below) and "All Other Claims" (defined below).

(DFOF at ¶ 109; PR at ¶ 109.)

any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Summary judgment is no longer a disfavored remedy. "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Id.*, at 327, 106 S.Ct. 2548. It "can be a tool of great utility in removing factually insubstantial cases from crowded dockets, freeing courts' trial time for those that really do raise genuine issues of material fact." *United Food and Commercial Workers Union Local No. 88 v. Middendorf Meat Co.*, 794 F.Supp. 328, 330 (E.D.Mo.1992). Thus, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548. "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). While a *material* fact is one that is "outcome determinative under the governing law", *Whetstine v. Gates Rubber Co.*, 895 F.2d 388, 392 (7th Cir.1990), a *genuine* issue as to that material fact is raised only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

The question whether a material issue of fact is *genuine* necessarily requires "some quantitative determination of sufficiency of the evidence." Childress, *A New Era for Summary Judgments: Recent Shifts at the Supreme Court*, 116 F.R.D. 183, 186 (1987). "Of course, a court still cannot resolve factual disputes that could go to a jury at trial, ... [b]ut no longer need the trial court leave every sufficiency issue for trial or a later directed verdict motion." *Id.* "A district judge faced with [a summary judgment motion] must decide, subject of course to plenary appellate review, whether the state of the evidence is such that, if the case were tried tomorrow, the plaintiff would have a fair chance of obtaining a verdict. If not, the motion should be granted and the case dismissed." *Palucki v. Sears, Roebuck & Co.*, 879 F.2d 1568, 1572–73 (7th Cir.1989) (citations omitted). Thus, a party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co. v. Zenith Radio Corporation*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "[A] party must produce 'specific facts showing that there remains a genuine issue for trial' and evidence 'significantly probative' as to any [material] fact claimed to be disputed." *Branson v. Price River Coal Company*, 853 F.2d 768, 771–72 (10th Cir.1988). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505. Nor may "[a] party to a lawsuit ... ward off summary judgment with an affidavit or deposition based on rumor or conjecture. 'Supporting and opposing affidavits shall be made on personal knowledge, ....'" *Palucki*, 879 F.2d at 1572 (7th Cir.1989). Such principles insure that summary judgment is utilized "when it can be shown that a trial would serve no useful purpose." *Windham v. Wyeth Laboratories, Inc.*, 786 F.Supp. 607, 610 (S.D.Miss.1992).

### A. RPC's Motion for Partial Summary Judgment

RPC moves for partial summary judgment vis-a-vis certain affirmative defenses raised by Kemutec. RPC's motions raise issues that are also raised in Kemutec's

separate motion for summary judgment, and to that extent the motions are considered together. First, Kemutec asserts that the disclaimer-of-warranties, limitation-of-remedies and waiver-of-claims provisions contained in its own standard terms and conditions govern this transaction. As such, Kemutec claims that RPC is barred from (1) asserting any claims for breach of express or implied warranties, other than claims based on the one-year express warranty contained in Kemutec's terms and conditions; (2) claiming consequential damages or any damages over and above the repair-and-replacement remedy contained in Kemutec's terms and conditions; and (3) asserting any claims for negligence or strict liability (collectively, "the UCC defenses"). (Kemutec's Answer at ¶¶ 111–112, 132, 141.) Second, Kemutec claims that the economic loss doctrine bars RPC's tort claims in this matter ("the economic loss defense"). (Id. at ¶ 114.) Third, Kemutec claims that RPC failed to notify Kemutec of the claimed defect within the time required under the contract and/or the Uniform Commercial Code ("UCC"), and also failed to start this action within the time allowed by the applicable statute of limitations ("the laches defenses"). (Id. at ¶¶ 109–110, 130.) The Court deals with each set of defenses in order.

### 1. The UCC Defenses

The viability of Kemutec's UCC defenses turns upon the outcome of a complicated "battle-of-the-forms" dispute. The question, in part, is whether the warranty disclaimers and remedy limitations contained in the pre-printed terms and conditions in Kemutec's March 18 Order Acknowledgment govern this transaction (assuming, for summary judgment purposes, that RPC received the latter document). That question, in turn, triggers a number of sub-issues, including which document constituted the "offer," which document (if any) constituted the "acceptance," and to what effect (if any) was Kemutec's Order Acknowledgment. Based on a detailed analysis of the underlying facts and legal principles, the Court concludes that the warranty disclaimers and remedy limitations contained in Kemutec's Order Acknowledgment did not become part of the underlying contract. Nevertheless, there is a genuine dispute of material fact concerning whether a remedy limitation excluding consequential damages is a "usage of trade" within the industry. Such a trade usage, if established, operates as a "gap-filling" or "supplementary" term which becomes part of the contract by operation of law. Moreover, assuming said limited remedy applies, there is an additional factual dispute concerning whether the same failed of its essential purpose. Accordingly, while the Court is able to narrow substantially the issues surrounding Kemutec's UCC defenses, summary judgment on the same is unavailing.

### a. The Offer

■ The first question is whether the February 11th quotation qualifies as an "offer" for purposes of forming a contract under the UCC.[15] The UCC does not define the term "offer." "[C]ourts . . . must

15. The parties do not dispute that the UCC—as adopted in either Wisconsin or New York—governs this "sale of goods." Regarding the choice of law, the parties do not dispute that Wisconsin law governs the issue of contract formation unless the terms and conditions contained in RPC's purchase order are deemed to control; specifically, the provision stating that the order shall be governed and interpreted in accordance with New York law. (Nicks Aff., Att. Tab No. 40.) As explained *infra*, neither party's standard terms and conditions became part of the contract, and thus the choice of law provision is inoperable. Accordingly, Wisconsin law applies. In Wisconsin, the portions of the UCC relevant to this dispute are found in Chapter 402 of the Wisconsin Statutes, and codification of the latter parallels the numbers used by the UCC, *i.e.*, section 2–207 of the UCC is found in section 402.207 of the Wisconsin Statutes. Throughout this opinion, the Court refers to the more familiar designations of the UCC rather than the Wisconsin statutes, but its formal citations are to the latter.

continue to first look to the common law to determine which communication constituted the 'offer' in order to apply [the contract formation principles of the UCC]." *Gulf States Utilities Company v. NEI Peebles Electric Products, Inc.*, 819 F.Supp. 538, 549 (M.D.La.1993). Under the common law, "[a]n offer is the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." RESTATEMENT (SECOND) OF CONTRACTS § 24 (1979). Wisconsin courts—like many courts—find it "difficult to determine when a quotation of prices is a definite offer and when it is merely a preliminary step in negotiations leading up to an offer." *Nickel v. Theresa Farmers Coop. Ass'n*, 247 Wis. 412, 415, 20 N.W.2d 117 (Wis.1945). Generally speaking, "a price quotation is considered an invitation for an offer, rather than an offer to form a binding contract." *White Consolidated Industries, Inc. v. McGill Manufacturing Co., Inc.*, 165 F.3d 1185, 1190 (8th Cir.1999).[16] "[T]he purchase order usually is the first document having the legal attributes of an offer." *Gulf States*, 819 F.Supp. at 549. That said, there are situations where a price quotation suffices as an offer, turning a subsequent purchase order into an acceptance (or at least an attempt to accept). What is required for a particular quotation to be treated as an offer is not subject to precise delineation. The question turns upon the unique facts and circumstances of each case:

> From the nature of the subject, the question whether certain acts or conduct constitute a definite proposal upon which a binding contract may be predicated without any further action on the part of the person from whom it proceeds or a mere preliminary step which is not susceptible, without further action by such party, of being converted into a binding contract depends upon the nature of the particular acts or conduct in question and the circumstances attending the transaction. It is impossible to formulate a general principle or criterion for its determination. Accordingly, whether a communication naming a price is a quotation or an offer depends upon the intention of the owner as it is manifested by the facts and circumstances of each particular case.

*Nickel*, 247 Wis. at 416, 20 N.W.2d 117 (quoting, 12 Am.Jur. at 527, § 28).

Relevant factors include the extent of prior inquiry, the completeness of the terms of the suggested bargain, and the number of persons to whom the price quotation is communicated. RESTATEMENT, *supra*, § 26 cmt. c. Often, the matter turns on the quotation's level of detail and completeness, *i.e.*, "it must reasonably appear from the price quote that assent to the quote is all that is needed to ripen the offer into a contract." *Brown Machine v. Hercules, Inc.*, 770 S.W.2d 416, 419 (Mo. App.1989). If the price quotation is sufficiently detailed, such that all a buyer need say is "I accept to create an enforceable contract, the quotation constitutes the offer." *Falcon Tankers, Inc. v. Litton Systems, Inc.*, 355 A.2d 898, 904 (Del.Super.1976).

The facts of this case establish the February 11th quotation as an offer. First, the quotation was not the initial substantive contact between the parties. Sage saw an ad for the Floveyor Conveyor in the paper and called Hajek to get information about the machine; specifically, to find out if a Floveyor Conveyor would be suitable for use in the food industry. Sage provided Hajek with complete specifications of RPC's blending room application. Hajek assured Sage that the Floveyor Conveyor was suitable for bakery applications and provided Sage with marketing information supporting this claim. Moreover, he took notes of RPC's specifications and drew sketches of the desired application. When these discussions ended, Ha-

---

16. Again, Wisconsin law applies, but the UCC has been adopted almost uniformly by the various States and case law from other jurisdictions is helpful in applying Wisconsin's version of the Code.

jek gave Sage a verbal quote for the machine, which Sage asked Hajek to confirm in a formal, written quote. Hajek telephoned Chalmers and relayed his notes and sketches, and Chalmers instructed Hajek to "quote the following." At that juncture, discussions moved beyond a preliminary "Q & A" session to the creation of a formal and specific offer. Indeed, the quote expressly stated that it "confirm[ed] [Hajek's] verbal quote of February 10, 1993...." That statement confirms that the written quote was more formal than a preliminary quotation for negotiation purposes. (Nicks Aff., Tab No. 23.)

■ Second, the quote contained all the necessary elements of an offer. It contained, *inter alia:* (1) A complete description of RPC's desired application, with a correspondingly detailed description of the Floveyor unit responsive to that application; (2) the quantity of goods; (3) the price; (4) an anticipated delivery date and the terms of delivery; and (5) the payment terms. There is nothing of significance lacking in these terms that prevents it from being an offer. The types of things that are missing—*e.g.,* warranty and remedy provisions, choice-of-law clauses, cancellation provisions, statements regarding additional or different terms, etc.—are terms which either the UCC or the common law provide as "gap-fillers." "Gap-fillers" are—by definition—unnecessary for a document to serve as an offer. *See, Step–Saver Data Systems, Inc. v. Wyse Technology,* 939 F.2d 91, 100 (3rd Cir.1991) (absence of warranty terms immaterial in light of UCC's gap-filling provisions). Indeed, several courts have held quotations to be "offers" on facts very close to those involved here. *See generally, Architectural Metal Systems, Inc. v. Consolidated Systems, Inc.* 58 F.3d 1227 (7th Cir.1995) (price quotation specifying items to be sold, the quantity and price of each item, and the delivery terms constituted an offer); *Reaction Molding Technologies, Inc. v. General Electric Company,* 585 F.Supp. 1097, *amended,* 588 F.Supp. 1280 (E.D.Pa. 1984) (quotation sent in response to buyer's request and containing terms of de-

scription, price, payment and delivery constitutes offer); *Boese–Hilburn Co. v. Dean Machinery Company,* 616 S.W.2d 520 (Mo. App.1981) (quotation containing terms of quantity, description and price constitutes offer); *Falcon Tankers, supra* (quotation detailing terms of quantity, description, price, payment and shipping constituted an offer); *Earl M. Jorgensen Co. v. Mark Construction, Inc.,* 56 Haw. 466, 540 P.2d 978 (1975) (where quotation contained terms of description, price, payment and time and place of delivery, and subsequent purchase order essentially mirrored those terms, quotation constituted offer).

Third, this was not a generalized or unsolicited quote sent to a number of potential customers, such as price lists in a catalog or other form of direct mail marketing. Rather, this was a specific quotation custom-designed for a specific customer at that customer's request and after a round of preliminary negotiations had concluded favorably. No further negotiations ensued. Indeed, a month went by without any further discussions. When Hajek finally visited RPC to check on the status of things, Sage told him the quote had been submitted for approval and that a purchase order would be forthcoming. There were no additional negotiations and no modification of the terms of the quotation. Obviously, both parties at this point were treating the quotation as an offer, *i.e.,* as a manifestation of AID's and Kemutec's willingness to enter into a contract on the specified terms, subject only to RPC's formal acceptance. Indeed, when RPC finally issued its purchase order, it mirrored the terms of the quotation and stated that it was submitted "per your quote # MDC/93/02/080/F." (Nicks Aff., Att. Tab No. 42.)

■ Kemutec argues that the quote was not intended to be an offer because the SRA executed between itself and AID required the latter to "specifically inform customers that all orders for Products taken by [AID] [were] subject to final acceptance by [Kemutec]." Moreover, RPC's

purchase order expressly called for Kemutec's "acceptance" and thus must be construed as the initial offer. Neither argument is compelling. The "acceptance" language in RPC's purchase order was found in the pre-printed terms and conditions on the reverse side of the order. Such boilerplate language is often immaterial when deciding whether a document should be construed as an offer or an acceptance. *See e.g., Wisconsin Electric Power Co. v. Zallea Bros., Inc.*, 443 F.Supp. 946, 950 (E.D.Wis.1978) (buyer's purchase order constituted acceptance of seller's quotation/offer, even though printed terms of purchase order called for further acceptance by seller), *aff'd*, 606 F.2d 697 (7th Cir.1979). "Given the use of standardized forms, the language employed by the parties will not always be determinative. Courts must often look beyond the words employed in favor of a test which examines the totality of the circumstances." *Challenge Machinery Co. v. Mattison Machine Works*, 138 Mich. App. 15, 359 N.W.2d 232, 235 (1984). The underlying circumstances of this case, detailed *supra*, establish the quotation as an offer. No reasonable jury could conclude otherwise, notwithstanding the boilerplate language contained in RPC's purchase order.

▮ Kemutec's second argument is equally unavailing. Where a seller reserves the right to accept or refuse any order submitted in response to a formal quotation, the quotation will not qualify as an offer. Something more than a subsequent order has to happen for a contract to result—namely, the seller's acceptance of the order—and thus the quotation is considered preliminary to the actual offer. *See e.g., Gulf States*, 819 F.Supp. at 549; *Brown Machine*, 770 S.W.2d at 419;

*Quaker State Mushroom Co. v. Dominick's Finer Foods Inc.*, 635 F.Supp. 1281, 1284 (N.D.Ill.1986); *McCarty v. Vernon Allsteel Press Co.*, 89 Ill.App.3d 498, 44 Ill.Dec. 570, 411 N.E.2d 936, 942–43 (1980). But the seller's intent is given priority in such cases because the same was communicated to the buyer, usually within the quotation itself. Here, neither version of the quotation—not Chalmers' draft to Hajek, nor Hajek's retyped version—stated that a subsequent purchase order would be subject to Kemutec's acceptance. Nor did anyone from AID or Kemutec communicate such a condition to RPC. As far as RPC knew, and as far as the objective evidence indicated, all RPC had to do to make a deal was say, "I accept your quotation." Kemutec's contrary understanding with AID was never expressed to RPC, and Kemutec's hidden intentions are neither dispositive of, nor material to, the status of the February 11th quotation.[17]

### b. The "Acceptance"

Having established the quotation as an offer, the Court must now consider the nature of RPC's acceptance, *i.e.*, the effect of RPC's two purchase orders. It is undisputed that AID was authorized to receive purchase orders on Kemutec's behalf. Accordingly, RPC's transmission of purchase orders to AID was synonymous with transmission to Kemutec. AID's subsequent failure to relay any portion of a purchase order to Kemutec did not affect the nature of that purchase order as submitted. Thus, when RPC issued its March 11th Purchase Order to AID, AID's failure to relay the portion containing RPC's terms and conditions did not operate to delete the same. However, when Chalmers saw the front page of this purchase order (which is the only page AID faxed to Kem-

---

17. Kemutec makes this very point in its own briefing: "What matters in contract formation is what the parties manifest to each other; unexpressed intentions are immaterial." (Kemutec Response Brief at 12.) The point takes on particular significance in light of the facts of this case. Chalmers of Kemutec was copied on the February 11th quotation and

could see that it did not attach Kemutec's standard terms and conditions, and also that it did not expressly reserve Kemutec's right to accept or reject any resulting purchase order. Roughly one month of subsequent inaction followed, during which Chalmers could easily have amended or clarified the quotation in this regard.

utec), he noticed that AID was listed as the vendor instead of Kemutec. Because Kemutec wanted to make sure it would have direct recourse against RPC for payment purposes, Chalmers called Sage of RPC and asked him to issue a new purchase order. Sage complied, issuing the March 15th Purchase Order. That order listed Kemutec as the vendor, but was otherwise identical to the March 11th Purchase Order, including its reference to, and inclusion of, RPC's standard terms and conditions on the reverse side. However, Sage's transmission of the new order was bifurcated. First, he faxed the front page of the order to both Hajek and Chalmers, without faxing the terms and conditions on the reverse side. Second, he mailed a full copy of the order to AID, front and back sides included. AID received the full copy in the mail and forwarded the same to Kemutec, but Hajek cannot remember precise dates for either event. Kemutec claims it never received the full copy of RPC's order, or if it did, that it did not arrive until after Kemutec issued its March 18 Order Acknowledgment. The foregoing leads to an obvious question: Should the March 15th Purchase Order be treated as though the terms and conditions on the reverse side were included (*i.e.*, the full copy controls) or should it be treated as though they were left out (*i.e.*, the faxed copy controls)? The Court need not answer that question, because under either scenario, the terms of Kemutec's Order Acknowledgment do not become part of the contract.

### i. Full copy controls.

█ If the full copy controls, it does not qualify as an acceptance under the UCC, but rather must be treated as a counter-offer. This conclusion is dictated by UCC § 2–207. Section 2–207—a frequent topic of conversation in cases involving the UCC—"is one of the most important, subtle, and difficult [provisions] in the entire Code, ...." *Gardner Zemke Co. v. Dunham Bush, Inc.*, 115 N.M. 260, 850 P.2d 319, 321 (1993). It is called an "iconoclastic" provision because it "was intend-

ed to alter the 'ribbon matching' or 'mirror' [image] rule of [the] common law...." *Id.; see also, Dorton v. Collins & Aikman Corporation*, 453 F.2d 1161, 1165 (6th Cir. 1972); *C. Itoh & Co. (America) Inc. v. Jordan International Co.*, 552 F.2d 1228, 1234–35 (7th Cir.1977); *Jorgensen*, 540 P.2d at 982. Under the mirror image rule, "a purported acceptance of an offer which attempted to modify one or more terms of the offer was a rejection of the offer and resulted in a counteroffer." *Jorgensen*, 540 P.2d at 982; *see also, Dorton*, 453 F.2d at 1166; *C. Itoh*, 552 F.2d at 1234. "If the offeror proceeded with the contract despite the differing terms of the supposed acceptance, he would, by his performance, constructively accept the terms of the 'counteroffer' and be bound by its terms." *Step–Saver*, 939 F.2d at 99. "As a result of these rules, the terms of the party who sent the last form, typically the seller, would become the terms of the parties contract." *Id.* "This result was known as the 'last shot rule.' " *Id.* Recognizing the growing impracticality of such rules in the modern economy, the drafters of the UCC "change[d] the common law in an attempt to conform contract law to modern day business transactions." *Gardner Zemke*, 850 P.2d at 322. Such transactions are typically characterized by reflexive exchanges of boilerplate documents, each containing conflicting or additional terms which were never discussed by the parties and which might not even reflect their actual intentions:

The UCC ... rejected this approach. Instead, it recognized that, while a party may desire the terms detailed in its form if a dispute, in fact, arises, most parties do not expect a dispute to arise when they first enter into a contract. As a result, most parties will proceed with the transaction even if they know that the terms of their form would not be enforced. The insight behind the rejection of the last shot rule is that it would be unfair to bind the buyer of goods to the standard terms of the seller, when neither party cared sufficiently

to establish expressly the terms of their agreement, simply because the seller sent the last form.

*Id.*

To better reflect the complicated nature of such transactions, the drafters of the UCC created section 2–207, which employs a more flexible approach to contract formation:

### Additional terms in acceptance or confirmation

■■■■■ (1) A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.

(2) The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless:

(a) The offer expressly limits acceptance to the terms of the offer;

(b) They materially alter it; or

(c) Notification of objection to them has already been given or is given within a reasonable time after notice of them is received.

(3) Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract. In such case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incor-

porated under any other provisions of chs. 401 to 411.

Wis.Stat. § 402.207. Under subsection (1) of the foregoing statute, the presence of additional or different terms in an accepting document does not automatically convert the acceptance into a counteroffer. Rather, the document is treated as an acceptance giving rise to a formal contract. *See, Stanley–Bostitch, Inc. v. Regenerative Environmental Equipment Co., Inc.,* 697 A.2d 323, 327 (R.I.1997). Once a contract is recognized under subsection (1), the Court proceeds to subsection (2) in order to determine whether the additional terms become part of the contract. *Id.* at 327–28. Under subsection (2), the additional terms are considered proposals for additions to the contract which, between merchants, will become part of the contract unless they alter it materially, are objected to, or the offer expressly limits acceptance to its own terms.[18] *Id.* at 328.

■■■■■ "However, while Section 2–207(1) constitutes a sharp departure from the common law 'mirror image' rule, there remain situations where the inclusion of an additional term in one of the forms exchanged by the parties will prevent the consummation of a contract...." *C. Itoh,* 552 F.2d at 1235. Subsection (1) "contains a proviso which operates to prevent an exchange of forms from creating a contract where 'acceptance is expressly made conditional on assent to the additional or different terms.'" *Id.; see also, Dresser Industries, Inc. v. The Gradall Co.,* 702 F.Supp. 726, 733 (E.D.Wis.1988), *aff'd,* 965 F.2d 1442 (7th Cir.1992); Wis.Stat. § 402.207(1). When such a "conditional acceptance" is employed, the acceptance is transformed

---

**18.** There is an ongoing debate concerning whether subsection (2) applies to both "additional" and "different" terms, the distinction being, respectively, between terms in the acceptance that address matters on which the offer was silent, and terms in the acceptance that directly contradict an express term in the offer. *See, White Consolidated Industries, Inc. v. McGill Manufacturing Co.,* 165 F.3d 1185, 1191 n. 6 (8th Cir.1999); *Reaction Molding Technologies Inc. v. General Electric Co.,* 585

F.Supp. 1097, 1105, *amended,* 588 F.Supp. 1280 (E.D.Pa.1984). The precise language of subsection (2) only addresses the fate of "additional" terms, but not all courts read that language as excluding "different" terms from its reach. *See e.g, Daitom, Inc. v. Pennwalt Corp.,* 741 F.2d 1569, 1578–79 (10th Cir. 1984) (collecting cases); *see also,* Wis.Stat. § 402.207(2). Because subsection (2) does not come into play on the facts of this case, the Court need not address the issue.

into a traditional counter-offer. *See, White Consolidated*, 165 F.3d at 1191; *see also, Dresser*, 702 F.Supp. at 733; *Falcon Tankers*, 355 A.2d at 906. No contract results "unless ... the offeror expressly assents to the additional or different terms in the offeree's response form." *Falcon Tankers*, 355 A.2d at 906. Where there is no express assent, "the entire transaction aborts at this point." *C. Itoh*, 552 F.2d at 1236 (quoting, *Dorton*, 453 F.2d at 1166). If, however, the parties proceed with performance, acting as though a contract existed, then subsection (3) of the statute recognizes the existence of a contract even though the various writings did not create one. *See, C. Itoh*, 552 F.2d at 1236 (quoting and citing, *Dorton*, 453 F.2d at 1166); *see also, Dresser*, 702 F.Supp. at 733; *Stanley–Bostitch*, 697 A.2d at 328. In such situations, "[t]he terms of the contract are those on which the parties' forms agree with any missing terms supplied by the UCC." *Stanley–Bostitch*, 697 A.2d at 328; *see also, C. Itoh*, 552 F.2d at 1236; *Dresser*, 702 F.Supp. at 733; Wis.Stat. § 402.207(3). "In regard to those terms in which the parties' forms are in conflict, 'each party must be assumed to object to a clause of the other *** and the conflicting terms do not become a part of the contract." *Stanley–Bostitch*, 697 A.2d at 328 (quoting, Official Comment to § 2–207, par. 6).

Furthermore, "[i]n order to fall within th[e] [subsection (1) ] proviso, it is not enough that an acceptance is expressly conditional on additional or different terms; rather, an acceptance must be expressly conditional on the *offeror's assent* to those terms." *C. Itoh*, 552 F.2d at 1235 (quoting, *Dorton*, 453 F.2d at 1168) (emphasis added). That said, a document need not mimic the language of the proviso in order to be a conditional acceptance. *White Consolidated*, 165 F.3d at 1191 (citing, *Ralph Shrader, Inc. v. Diamond International Corp.*, 833 F.2d 1210, 1215 n. 4 (6th Cir.1987)); *see also, C. Itoh*, 552 F.2d at 1235 (discussing *Construction Aggregates Corp. v. Hewitt–Robins, Inc.*, a 7th Circuit decision finding a conditional acceptance "even though the language employed in the acceptance did not precisely track that of the proviso"). "To require the exact language of the UCC would be too formalistic and inconsistent with the UCC's requirement that its provisions be liberally construed." *White Consolidated*, 165 F.3d at 1191; *see also, Ralph Shrader*, 833 F.2d at 1215 n. 4. Rather, it is only necessary that the acceptance itself, and/or "the circumstances leading up to and surrounding [the acceptance]," *see, Luria Brothers & Co., Inc. v. Pielet Brothers Scrap Iron & Metal, Inc.*, 600 F.2d 103, 113 n. 12 (7th Cir.1979), "go[ ] beyond" making the acceptance "subject to" its own terms and conditions, *see, Dresser*, 702 F.Supp. at 732, such that it becomes clear that the offeree is "unwilling to proceed unless assured of the offeror's assent to the additional or different terms." *Ralph Shrader*, 833 F.2d at 1214 (quoting, *Challenge Machinery Co. v. Mattison Machine Works*, 138 Mich.App. 15, 359 N.W.2d 232, 237 (1984)).

Applying the foregoing principles, RPC's March 15 Purchase Order, construed as including the terms and conditions contained on the reverse side, constitutes a "conditional acceptance." The order was not merely "subject to" its attached terms and conditions, as was the order in *Dorton*. Rather, the order stated expressly that it was "SUBJECT TO *ACCEPTANCE* OF THE ADDITIONAL TERMS AND CONDITIONS ON THE REVERSE SIDE." (Emphasis added.) By emphasizing *"acceptance"* of the attached terms as a condition to its own acceptance, RPC "goes beyond" the "subject to" language referred to in *Dorton* and makes clear that Kemutec's *assent* to the additional terms is the pivotal condition. Indeed, this language is more direct than, or at least similar to, language which other courts have relied upon to create a conditional acceptance. *See e.g., Dresser*, 702 F.Supp. at 732 (acknowledgment form stating that it was "subject to and *conditioned on the understanding*

that our terms of sales ... and no others apply ..." constituted conditional acceptance); *Construction Aggregates*, 404 F.2d at 509 (letter stating that acceptance "predicated on the following clarifications, additions or modifications" constituted conditional acceptance); *Ralph Shrader*, 833 F.2d at 1214–15 (acceptance stating that "[t]he terms set forth on the reverse side are the only ones upon which we will accept orders" constitutes a conditional acceptance); *Diamond Fruit Growers, Inc. v. Krack Corp.*, 794 F.2d 1440 (9th Cir.1986) (proviso applies where acceptance "tracks the language of section 2–207(1)" and states that "acceptance ... is hereby expressly made conditional to purchaser's acceptance of the terms and provisions of the acknowledgment form"); *Uniroyal, Inc. v. Chambers Gasket & Mfg. Co.*, 177 Ind.App. 508, 380 N.E.2d 571 (1978) (proviso applies where acceptance stated that "acceptance of the order is conditional on the buyer's acceptance of the conditions of sale printed on the reverse side hereof"). Based on the foregoing factual record and case law, the proviso of subsection (1) is applicable to RPC's purchase order.

█ Treating RPC's purchase order as a conditional acceptance means that it did not, by itself, create a contract. Rather, Kemutec's express assent to the additional and different terms was required, which did not happen. Kemutec's only response (if any) was its March 18 Order Acknowledgment, which directly contradicted RPC's purchase order on the critical matter of applicable warranties, and which itself stated its own "terms and conditions shall supersede all prior oral or written documents or statements of any kind delivered or made ... by the parties hereto, ...." (Nicks Aff., Att. Tab No. 51.) Where a response to a conditional acceptance changes one of the terms contained therein, or states that its own terms must control the transaction, there is no "express assent" for purposes of the subsec-

tion (1) proviso.[19] *See e.g., Dresser*, 965 F.2d at 1449; *White Consolidated*, 165 F.3d at 1191; *Boise Cascade Corp. v. Etsco, Ltd.*, 1984 WL 178957 (D.Or.1984).

Despite the lack of a written contract, the parties performed as though an agreement had been reached. Such performance gives rise to a contract under § 2–207(3). *See,* Wis.Stat. § 402.207(3). As indicated above, the terms of that contract are those upon which the parties' forms agree, plus any supplementary terms provided by the UCC. *Id.* Here, the various forms agree upon only the most basic elements of the transaction, *i.e.*, the quantity, price, delivery, payment terms, and equipment specifications. The question is what other terms are filled in by the supplementary provisions of the UCC; specifically, does the UCC supply any terms related to warranties and/or a buyer's remedies in the event of breach? Clearly, it does. Sections 2–314 and 2–315 provide for implied warranties of merchantability and fitness for a particular purpose. *See,* Wis. Stat. §§ 402.314 & 402.315. Section 2–714 allows a buyer to recover as damages "the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable," including "incidental and consequential damages" as those terms are defined under § 2–715. *See,* Wis.Stat. §§ 402.714 & 402.715. Under normal circumstances, these provisions would control and RPC would be entitled to full warranties and the recovery of consequential damages. However, as discussed *infra,* these may not be normal circumstances. Kemutec submits evidence of a trade usage that may limit RPC's remedies. Before discussing that issue—which applies regardless of which copy of RPC's purchase order controls—the Court explains briefly why reliance upon the faxed copy of the March 15th Purchase Order leads to the same result.

---

**19.** Nor is Kemutec likely to argue that it "expressly assent[ed]," because doing so would register its agreement to RPC's warranty terms and rule out the application of its own terms and conditions.

### ii. Faxed copy controls.

■ If the faxed copy controls, RPC's terms and conditions are non-existent and the Court is left with a written acceptance which matches the terms of Kemutec's offer. At that point, a contract is formed. What is more, the terms of the contract are clear by virtue of an unconditional acceptance which mirrors the terms of the offer. The Court need not consider any subsequent forms issued by the parties, including Kemutec's March 18 Order Acknowledgment, because the contract is complete and reduced to writing. Put another way, Kemutec's order acknowledgment does not trigger a battle of the forms under either subsection (2) or subsection (3) of § 2–207: Subsection (2) applies only if the acceptance proposes terms additional to, or different from, the terms of the offer, and subsection (3) applies only if no contract is formed through the parties' writings. Once a complete contract is reached through writings that do not vary in their terms, subsequent writings are immaterial. As one commentator explains, "[w]hen a written contract is formed based on a purchase order, a later writing does not call UCC § 2–207 into operation." 2 Anderson, *Uniform Commercial Code,* § 2–207:5 at 272–273. Several courts acknowledge this basic principle. *See e.g., Magliozzi v. P & T Container Service Co., Inc.,* 34 Mass.App.Ct. 591, 614 N.E.2d 690, 691–92 (1993); *Tubelite v. Risica & Sons, Inc.,* 819 S.W.2d 801, 803–04 (Tex.1991); *Graham Paper Co. v. Schottco Corp.,* 555 F.2d 193, 197 (8th Cir.1977); *Southwest Engineering Co., Inc. v. Martin Tractor Co., Inc.,* 205 Kan. 684, 473 P.2d 18, 25–26

(1970); *Jorgensen,* 540 P.2d at 982–83. Accordingly, even if the faxed copy of the March 15 Purchase Order controls, the terms of the contract are those on which the writings agree, plus any supplementary provisions under the Code.

### c. Supplementary Terms

■ As indicated *supra,* Kemutec submits evidence of a prior course of dealing between the parties and evidence of an applicable usage of trade which, if applicable, operate to disclaim all implied warranties and/or bar the recovery of consequential damages. Under the UCC, evidence of a course of dealing or an applicable usage of trade can "supplement or qualify terms of an agreement." *See, Dresser,* 965 F.2d at 1449–1452; *see also,* Wis.Stat. § 401.205.[20] Accordingly, sufficient evidence of the relevant trade usage or course of dealing would preclude summary judgment on Kemutec's UCC defenses. While the Court is confident that Kemutec's evidence on "course of dealing" fails in this regard, the Court reaches a contrary conclusion regarding trade usage.

■ As an alleged course of dealing, Kemutec refers to the 17 transactions which took place between itself and RPC prior to the 1993 purchase of the Floveyor Conveyor. In 15 of those transactions—most of which were the result of oral purchase orders communicated over the phone—the only written expressions of the parties' agreements were Kemutec's subsequent invoices, all of which contained Kemutec's standard terms and conditions. From this fact Kemutec argues that the

**20.** Section 401.205 of the Wisconsin Statutes reads, in relevant part:

(1) A course of dealing is a sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct.

(2) A usage of trade is any practice or method of dealing having such regularity of observance in a place, vocation or trade as to justify an expectation that it will be observed with respect to the transaction in question. The existence and scope of such a usage are to be proved as facts. If it is established that such a usage is embodied in a written trade code or similar writing the interpretation of the writing is for the court.

(3) A course of dealing between parties and any usage of trade in the vocation or trade in which they are engaged or of which they are or should be aware give particular meaning to and supplement or qualify terms of an agreement.

parties had a prior course of dealing whereby transactions between the two were governed by Kemutec's standard terms and conditions.[21] The Court disagrees. The UCC defines a course of dealing as "a sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct." Wis.Stat. § 401.205(1). The prior transactions between RPC and Kemutec cannot "fairly ... be regarded as establishing a common basis of understanding" for purposes of the 1993 transaction, because the prior transactions were dramatically smaller in scope and importance than the 1993 transaction. That is, 16 of the 17 prior transactions involved nothing more than RPC's purchase of spare parts for existing equipment at an average cost in the hundreds of dollars. Given the small amount of money at issue in each of these prior transactions, as well as the qualitative difference between purchasing an occasional spare part and purchasing a complex piece of equipment critical to a company's operations, one cannot reasonably suggest that the parties' course of dealing in the former context indicates a "common basis of understanding" for their dealings in the latter.[22] See e.g., Wilson v. Marquette Electronics, Inc., 630 F.2d 575, 581 (8th Cir. 1980) (prior sales of equipment of "different nature and magnitude" than transaction at issue do not create relevant course of dealing); Capital Steel Company, Inc. v. Foster and Creighton Co., 264 Ark. 683, 574 S.W.2d 256, 258 (1978) (course of dealing irrelevant where prior sales of steel were much smaller than larger quantity of steel involved in the litigated transaction); Atalanta Corp. v. Ohio Valley Provision Co., 489 Pa. 389, 414 A.2d 123, 126 (1980) (prior transaction representing less of a financial risk irrelevant as prior course of dealing to larger transaction with more substantial financial obligation). Moreover, in the only prior transaction similar in nature and scope to the 1993 transaction—RPC's 1987 purchase of a $11,000 sifter—Kemutec's invoice was not the sole written expression of the parties' agreement. Rather, RPC issued a written purchase order containing its own terms and conditions, and Kemutec issued an invoice also containing its own terms and conditions. The parties exchanged competing forms, just as they did in the 1993 transaction. Thus, contrary to Kemutec's view of the facts, the prior course of dealing indicates that RPC attempted to impose its own terms and conditions—including its own warranty terms—upon any large purchase of capital equipment from Kemutec.

As for trade usage, Kemutec submits the reports of two expert witnesses—one with over 30 years of experience working for purchasers of food processing equipment, and one with over 40 years of experience working for manufacturers of food processing equipment—setting forth their parallel opinions that manufacturers and processors within the food industry understand that sales of food processing equipment are subject to remedy limitations barring consequential damages. The underlying rationale for this industry custom is plausible enough: (1) The average purchase price of food processing equipment like the Floveyor Conveyor is roughly $10,000; (2) the typical profit mar-

---

21. To be precise, Kemutec uses this evidence to rebut the suggestion that its warranty disclaimers and remedy limitations "materially altered" RPC's purchase order. Kemutec argues that such a change could not come as a surprise to RPC in light of the parties' prior course of dealing and therefore could not be considered a material alteration. Such arguments presume, however, that UCC § 2–207(2) controls the issue of contract formation, an assumption the Court has already rejected supra. The argument is relevant to the issue of supplementary terms, however, and will be considered in that context.

22. The existence of a relevant course of dealing is ordinarily a question of fact, but as with all factual issues, where evidence on the issue is such that reasonable minds could draw but one conclusion, the question becomes one of law. See, Kessel v. Western Savings Credit Union, 463 N.W.2d 629, 630 (N.D.1990).

gin for the same is somewhere between 5% and 10%; (3) the potential damages flowing from a defect in such equipment are astronomical, given that a defect might contaminate food products sold throughout the country, requiring a multi-million dollar recall effort such as the one that occurred here; and (4) in light of the foregoing, "[n]o responsible business person would bet his company on a $10,000.00 sale with a $500.00 profit." (Nicks Aff., Tab No. 29 ("Stroup Report").) As the 7th Circuit stated when evaluating the admissibility of similar expert testimony, "[a]lthough we are in no position to determine whether the custom alleged . . . actually exists, the hypothesis that it exists is certainly not so incredible that testimony on the subject could be excluded by analogy to the principle that excludes testimony in contradiction of the laws of nature." *Western Industries, Inc. v. Newcor Canada Limited,* 739 F.2d 1198, 1203 (7th Cir. 1984). And while RPC raises valid criticisms of the factual basis for the opinions of these two experts, including its own expert's report contradicting those opinions, such attacks go to the weight of the evidence and are the stuff of cross examination, not summary judgment. *See id.* at 1202 (court "may not screen [expert] witnesses simply to decide whether their testimony is persuasive," but rather should allow "criticisms" of the testimony to be "put before the jury . . . in cross-examination"). Indeed, given the length of time Kemutec's experts spent in the relevant industry, and the liberal "chain of inference" accorded to testimony on matters of trade usage, opinions based on nothing more than their personal observations are sufficient to get to the jury:

> Of course testimony of trade custom is testimony to a conclusion; and though all evidence, even eyewitness testimony,

is inferential to a degree . . . the chain of inference is longer when the fact testified to is the existence of a trade custom than when it is the color of the defendant's hair. If the members of this court had been called as witnesses in this case and asked whether it was the custom of the specialty welding machine trade not to give disappointed buyers consequential damages, we would not have been competent to answer. But Newcor's witnesses were experienced executives in the trade, and the existence of the alleged custom was a matter they could infer from their own observations and experience, since each had negotiated many sale contracts such as the one in issue in this case.

*Id.* at 1202–03.[23]

#### d. Failure of Essential Purpose

 RPC argues, however, that even if the contract is construed as including a limited remedy of repair or replacement which bars the recovery of consequential damages, said remedy "fails of its essential purpose" under UCC § 2–719(2). That section of the Code provides that "[w]here circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in chs. 401 to 411." Wis.Stat. § 402.719(2). Generally speaking, "[t]his section . . . applies when the remedy is ineffectual or when the seller fails to live up to the remedy's provisions, either of which deprives the buyer of the benefit of the bargain." *Waukesha Foundry, Inc. v. Industrial Engineering, Inc.,* 91 F.3d 1002, 1010 (7th Cir.1996). However, when interpreting this section, the Wisconsin Supreme Court emphasizes that "the UCC disfavors limitations on remedies and provides for their deletion where they would

---

**23.** The Court notes that other courts and commentators conclude that a usage of trade can only be used to disclaim warranties and can never be relied upon to imply a limitation of remedies. *See e.g., Gates v. Abernathy,* 1972 WL 20882 (Okla.App.1972); Kloster, *Trade Usage, Exclusive Remedies, and U.C.C. Section 2–719(1)(b),* 25 Houston L.Rev. 363

(March, 1988). That position, though compelling in many respects, is irrelevant here: RPC makes no such argument, and the 7th Circuit has rejected the same in an opinion interpreting Wisconsin law, which opinion is binding upon this Court. *See, Western Industries,* 739 F.2d at 1204–05.

effectively deprive a party of reasonable protection against breach." *Murray v. Holiday Rambler, Inc.*, 83 Wis.2d 406, 418, 265 N.W.2d 513 (1978). The same court explains that the drafters of the UCC recognized that "it is of the very essence of a sales contract that at least minimum adequate remedies be available." *Id.* at 418, 265 N.W.2d 513 (quoting, Wis.Stat. § 402.719, *Official Comment (1)* ). Therefore, under Wisconsin law, "[i]f the parties intend to conclude a contract for sale within [Article 2 of the UCC] they must accept the legal consequence that there be at least a fair quantum of remedy for breach of the obligations or duties outlined in the contract...." *Id.* at 419–19, 265 N.W.2d 513 (quoting, Wis.Stat. § 402.719, *Official Comment (1)* ). Thus, the Wisconsin Supreme Court refuses to enforce a limited remedy of repair and replacement when it would "only minusculey compensate[ ] the purchaser" of a defective product, or otherwise "provide[ ] damages that are, in the circumstances, unconscionably low," particularly where the facts suggest that the seller knew or had reason to know that the product would fail. *Phillips Petroleum Co. v. Bucyrus–Erie Co.*, 131 Wis.2d 21, 39–40, 388 N.W.2d 584 (Wis.1986).[24]

Relying on Wisconsin's seemingly broad interpretation of § 2–719(2), RPC argues that a remedy which excludes consequential damages fails of its essential purpose because it would not compensate RPC for the $11 million in damages it suffered by way of recall costs and lost profits. This is certainly a viable argument. As in *Phillips,* one plausible interpretation of the evidence is that repair or replacement of the Conveyor would only "minusculey compensate[ ]" RPC for a catastrophic loss, a loss incurred under circumstances suggest-

ing that Kemutec may have known that the Conveyor's rope assemblies tended to fail and break. *Id.* Kemutec argues, however, that the question of whether repair or replacement fails as a remedy is immaterial. Kemutec cites case law from other jurisdictions for the proposition that "a consequential damages disclaimer [is] considered separately from a clause limiting remedies to repair or replacement." *See, Fidelity and Deposit Company of Maryland v. Krebs Engineers,* 859 F.2d 501, 504 (7th Cir.1988) (collecting cases). According to these courts, "[e]ven if the limited remedy fails of its essential purpose, the consequential damages exclusion should remain in effect...." *Id.* (collecting cases); *see also, McKernan v. United Technologies Corp.,* 717 F.Supp. 60, 69–73 (D.Conn. 1989) (collecting and discussing cases). Such exclusions may only be challenged in these jurisdictions if they are "unconscionable" under subsection (3) of the statute, and subsection (2)'s "failure of essential purpose" language is inapplicable. *See, McKernan,* 717 F.Supp. at 70 ("... the current trend is to characterize an exclusionary contractual provision as a discrete and independent agreement whose validity is to be judged by the standards prescribed in subsection (3) of section 42a–2–719 ... "[s]ubsection (3) places no restrictions on the allocation of risk for absorption of commercial loss, except that such allocation must not be unconscionable." ").

■ While Kemutec's proffered distinction between limited remedies and damage disclaimers may reflect "the current trend" in courts throughout the country, the same has been flatly rejected by the Wisconsin Supreme Court. The 7th Circuit acknowledged this development in the *Krebs* case:

RPC obtained or was provided a replacement rope which failed after minimal hours of operation, but the record is not sufficiently developed on this point. Moreover, there is the question of whether an effective repair or replacement would have been enough, considering that it probably would not have prevented the recall effort, which forms the bulk of RPC's damages.

---

**24.** Such a remedy also fails under Wisconsin law 'whenever, despite reasonable opportunity for repair, the goods are not restored to a nondefective condition within a reasonable time, whether or not the failure to do so is willful.' *Murray,* 83 Wis.2d at 424, 265 N.W.2d 513. There is no clear indication in the record whether RPC sought repair or replacement of the Floveyor Conveyor as a remedy from Kemutec. There is evidence that

Krebs does not contest the district court's finding that the exclusive contract remedy failed of its essential purpose. Krebs does argue, though, that the district court erred by refusing to give effect to the consequential damages disclaimer. According to Krebs, a consequential damages disclaimer should be considered separately from a clause limiting remedies to repair or replacement. Even if the limited remedy fails of its essential purpose, the consequential damages exclusion should remain in effect unless no other effective remedy (for example, incidental damages, Wis. Stat.Ann. § 402.715(1) or difference-in-value damages, Wis.Stat.Ann. § 402.714(2)) remains.

Other courts have given effect to consequential damages disclaimers even when exclusive remedies failed of their essential purposes. E.g., *Chatlos Systems v. National Cash Register Corp.*, 635 F.2d 1081, 1085–86 (3d Cir.1980); *S.M. Wilson & Co. v. Smith International Inc.*, 587 F.2d 1363, 1374–76 (9th Cir.1978). But whatever the merits of Krebs' argument as an original matter, it is not Wisconsin law. In *Murray v. Holiday Rambler, Inc.*, supra, the Wisconsin Supreme Court held:

> Where the exclusive limited remedy of the contract fails of its essential purpose ... the buyer is entitled to invoke any of the remedies available under the UCC. This includes the right to recover consequential damages under sec. 402.715.
>
> · · · · ·
>
> Thus, although an express warranty excludes consequential damages, when the exclusive contractual remedy fails, the buyer may recover consequential damages ... as though the limitation had never existed.

*Krebs*, 859 F.2d at 504 (quoting, *Murray*, 83 Wis.2d at 430, 432, 265 N.W.2d 513). Kemutec relies upon contrary cases from New York and suggests that the choice-of-law provision contained in RPC's purchase order somehow controls the issue. Of course, as explained *supra*, neither RPC's nor Kemutec's standard terms and conditions made their way into the parties' contract, and thus New York law does not apply to any aspect of this case. Under Wisconsin's interpretation of UCC §§ 2–719(2) & (3), a damages disclaimer is not enforceable if the remaining or exclusive remedy "fails of its essential purpose."

■ Nevertheless, though Kemutec's argument is unavailing, genuine disputes of material fact prevent the Court from concluding that the limited remedy in this case, if any, failed its essential purpose. RPC's argument in this regard is based solely on the huge disparity between the damages claimed and the damages that could be awarded if consequential damages are excluded. The alleged disparity assumes that a jury would find that Kemutec's breach, if any, proximately caused all of RPC's so-called "consequential damages." Kemutec intends to challenge this assumption with evidence that RPC's failure to purchase effective metal detection equipment, as well as its failure to properly maintain the Conveyor (and document said maintenance), caused RPC to incur the massive recall costs and lost profits it claims as damages. Kemutec also submits evidence that it had no reason to suspect that the rope assemblies of the Floveyor Conveyor were defective. If a jury accepts this evidence, the alleged disparity may dissolve and/or the underlying circumstances may change. For that reason, the Court cannot resolve the issue on summary judgment.

Based on the foregoing analysis, RPC's motion for summary judgment as to Kemutec's UCC defenses is denied, but only insofar as there are genuine disputes regarding (1) the existence of an alleged trade usage barring the recovery of consequential damages within the context of food processing equipment,[25] and (2)

---

**25.** In this regard, the verdict form will have to include a special interrogatory asking the jury to determine whether the alleged trade usage actually exists.

whether any limited remedy applicable to this transaction failed of its essential purpose. Kemutec's remaining arguments suggesting that the terms and conditions contained in its order acknowledgment became part of the contract, or that a damages disclaimer survives even if the remaining remedy fails of its essential purpose, are rejected as a matter of law.

### 2. The Economic Loss Defense

In addition to its contract and warranty claims, RPC asserts several tort claims in this action, including claims for negligent and intentional misrepresentation, negligent and strict liability failure to warn, and negligent and strict liability design and manufacture. Kemutec argues that all of the tort claims are barred by Wisconsin's version of the economic loss doctrine. RPC argues that the economic loss doctrine is inapplicable because the Floveyor Conveyor did not merely fail to perform as expected but also damaged "other property"—namely, RPC's food products—resulting in millions of dollars in recall costs. Said arguments, while pertinent to the analysis, do not address all of the issues triggered by the economic loss doctrine in this case. A proper economic loss analysis requires consideration of three pertinent questions: (1) Does the case involve only "economic" loss; (2) does the case fall within a limited "public safety" exception to the economic loss rule; and (3) does the economic loss doctrine preclude the assertion of RPC's misrepresentation claims, particularly its claim for intentional misrepresentation.

 This Court has previously wrestled with Wisconsin's application of the economic loss doctrine, "pursuant to which a party bringing a tort claim cannot recover damages that are solely 'economic' in character if its claim arises out of a commercial transaction." *Raytheon Company v. McGraw–Edison Company, Inc.,*

979 F.Supp. 858, 866 (E.D.Wis.1997) (quoting, *Stoughton Trailers, Inc. v. Henkel Corp.,* 965 F.Supp. 1227, 1230 (W.D.Wis. 1997)). Just what it means for an injury or loss to be solely "economic" requires clarification. An injury is not "economic" simply because it is monetary. All losses—even those stemming from injuries to the person or damage to property—are monetary in nature, *i.e.,* "they destroy values which can be and are monetized." *Miller v. United States Steel Corp.,* 902 F.2d 573, 574 (7th Cir.1990). "Economic loss" is better described as a term of art used to distinguish *commercial* injury to a person or business from *physical* or *personal* injury to a person or property. *Id.* Commercial injuries are the type on which a breach of contract or breach of warranty suit is based. Physical or personal injuries are "the type . . . on which a products liability suit usually is founded." *Id.* The basic principle underlying the economic loss doctrine is that the distinction between commercial and personal injuries, and the types of claims that result therefrom, should not be blurred. Rather, disputes over commercial injuries ought to be resolved by the laws of commerce, and disputes over physical or personal injuries ought to be resolved by the laws of tort.[26]

The foregoing premise simply reflects the different societal interests involved in the two different arenas. In the commercial setting, society places a premium on freedom of contract. Society allows the parties *to* set the terms of their bargain and only intervenes to enforce or give meaning to those terms once a dispute develops. Even within the context of a dispute, society is not motivated to do what is fair or just in some abstract sense, but rather seeks to divine and enforce the justifiable expectations of the parties as determined from the language of their contract. To that end, if the parties agree in

---

**26.** Indeed, because of this very distinction, the 7th Circuit repeatedly suggests that "commercial loss" would be a better name for the underlying doctrine, rather than economic loss. *See, Miller,* 902 F.2d at 574; *see also,*

*All–Tech Telecom, Inc. v. Amway Corp.,* 174 F.3d 862, 865 (7th Cir.1999). The Court agrees, but because the term "economic loss" is entrenched within the case law, the Court continues its use herein.

advance to place limits upon the remedies that are available in the event of a breach, society typically honors that agreement regardless of its consequences. In the tort setting, however, society places a premium on protecting people and property from unreasonable dangers. The overriding concern is to provide a level of compensation which makes the victim whole and which protects society at large by discouraging the development of harmful products and conduct. To that end, when someone suffers personal injury or property damage, society intervenes to provide monetary redress, and the degree of redress is open-ended, limited only by the requirements of causation and public policy. Indeed, if the cause of harm is sufficiently egregious, society may punish the wrongdoer by awarding punitive damages, a form of compensation unhindered by principles of causation and which has no application in the law of contract.

Given these different societal interests, one can see how blurring the distinction between commercial causes of action and tort causes of action undermines the respective societal goals of each. If one party to a contract may sue the other in tort for a breach of their contract, the focus of liability shifts from the justifiable expectations of the two parties to societal notions of fairness and deterrence. The process of negotiation and bargaining which precedes and results in a contract will be meaningless, because either party may seek in a tort claim what they were unable to obtain—and might have expressly conceded—in their negotiations. If society is allowed to second-guess the intentions of contracting parties in this manner, freedom of contract is nullified. Put another way, the "law of contract [will] drown in a sea of tort." *General Casualty Co. of Wisconsin v. Ford Motor Co.,* 225 Wis.2d 353, 592 N.W.2d 198, 201 (1999) (quoting, *East River Steamship Corp. v. Transamerica Delaval, Inc.,* 476 U.S. 858,

866, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986)). Conversely, if someone who suffers personal injury or property damage through the use of a defective product is limited to contractual remedies, the focus shifts from society's desire to protect its members to the nature of the relationship between the victim and the alleged wrongdoer. Historically, if there was no direct relationship between the victim and the wrongdoer (*i.e.,* if there was no privity of contract) the victim could not recover. Moreover, even where there was privity, the victim could not recover if the underlying contract failed to include any promises or warranties regarding the quality or safety of the product for its intended use. Under this approach, society's principal means of protecting itself from unreasonably dangerous products would be to negotiate such protection one contract at a time, a frequently impractical and unfair approach in today's modern economy. Tort law would, in a very significant sense, drown in a sea of contract.[27]

Thus, the important work of the economic loss doctrine is to prevent the law of contract and the law of tort from dissolving one into the other. It accomplishes this task utilizing a basic rule of thumb: "[W]hen contractual expectations are frustrated because of a defect in the subject matter of the contract, a party's remedy lies exclusively in contract. However, when the subject matter of a contract causes physical harm to persons or property other than the subject matter itself, a remedy lies in tort." *Raytheon,* 979 F.Supp. at 866. This rule, though fairly straightforward, spawns a deluge of case law on an annual basis as various state and federal courts try to fine tune its application and stake its logical limits. While Wisconsin courts are no exception to this trend, it is the Court's belief that the end—defined as an economic loss rule with a well-defined and logical reach—is within

---

**27.** Such concerns were among those giving rise to the modern doctrine of strict liability in tort, which does away with the requirement of privity and other vestiges of the law of contract in those situations where a product placed into the stream of commerce causes injury to persons or property.

sight. That said, there are still cases—such as the one before the Court—where application of the rule requires a journey into unchartered or disputed territory. In such cases, a Wisconsin federal court sitting in diversity often has to predict what the Wisconsin Supreme Court would do in a given case. When doing so, it is appropriate to consider the policies underlying Wisconsin's application of the economic loss doctrine:

> (1) to maintain the fundamental distinction between tort law and contract law; (2) to protect commercial parties' freedom to allocate economic risk by contract; and (3) to encourage the party best situated to assess the risk [of] economic loss, the commercial purchaser, to assume, allocate, or insure against that risk.

*Daanen & Janssen, Inc. v. Cedarapids, Inc.*, 216 Wis.2d 395, 403, 573 N.W.2d 842 (Wis.1998). With these policies in mind, the Court considers the issues underlying the economic-loss analysis in this case.

### a. *"Economic Loss"*

 The first question is whether this case truly and solely involves "economic loss." The Wisconsin Supreme Court has comprehensively described the possible components of economic loss. In the context of a sale of goods, " '[e]conomic loss' may be defined generally as 'the diminution in the value of the product because it is inferior in quality and does not work for the general purposes for which it was manufactured and sold.' " *Northridge Company v. W.R. Grace and Company*, 162 Wis.2d 918, 925–26, 471 N.W.2d 179 (Wis.1991) (quoting, Comment, *Manufacturers' Liability to Remote Purchasers for "Economic Loss" Damages—Tort or Contract?*, 114 U.Pa.L.Rev. 539, 541 (1966)). "Economic loss has also been described in terms of direct economic loss and consequential economic loss." *Id.* at 926, 471 N.W.2d 179. "Direct economic loss may be said to encompass damage based on insufficient product value; thus, direct economic loss may be 'out-of-pocket'—the difference in value between what is given and

received—or 'loss of bargain'—the difference between the value of what is received and its value as represented." *Id.* (quoting, Note, *Economic Loss in Products Liability Jurisprudence*, 66 Colum.L.Rev. 917, 918 (1966)). "Direct economic loss also may be measured by costs of replacement and repair." *Id.* "Consequential economic loss includes all indirect loss, such as loss of profits resulting from inability to make use of the defective product." *Id.* Central to all of these various components of "economic loss," however, is that the damages flow solely from damage to the product itself. When damages flow from injury or damage to persons or property other than the product itself, they are no longer considered an economic loss. This principle is well-established in Wisconsin and may be referred to as the "other property" exception to the economic loss rule:

> In short, economic loss is damage to a product itself or monetary loss caused by the defective product, which does not cause personal injury or damage to other property.

*Daanen*, 216 Wis.2d at 402, 573 N.W.2d 842; *see also, Tony Spychalla Farms, Inc. v. Hopkins Agricultural Chemical Co.*, 151 Wis.2d 431, 444 N.W.2d 743 (Wis.App. 1989).

 There is no disputing that RPC suffered damages to "other property" as a result of the alleged defect in the Floveyor Conveyor. When the rope assemblies frayed, wire strands broke off the assemblies and contaminated food product running through the Conveyor. This food product is "other property" for purposes of the economic loss rule. *See e.g., Tony Spychalla, supra* (damage to corn crop caused by crop dust designed to prevent the corn from rotting is damage to "other property"). The question presented by this case, however, is how much "other property" must be damaged in order to take a case outside the economic loss rule. The only evidence to date—the rope failures having occurred some five years

ago—is that 29 pieces of wire found their way into RPC's food product. This is 29 pieces of wire over an 11–12 month period during which roughly *6 million cases* of product were processed through the Appleton facility, each containing between 12 to 24 individual products.[28] Does such a relatively small amount of damage to "Nother property" lift this case out of the realm of contract and into the law of tort?

Over ten years ago, Judge Myron Gordon—presiding over another branch of this Court—confronted the same issue in *Wisconsin Public Service Corp. v. Ecodyne Corp.*, 702 F.Supp. 217 (E.D.Wis.1988). Judge Gordon observed at the time that "[n]o Wisconsin court has addressed whether a party to a purely commercial contract dispute may also recover tort damages when there is minimal damage to other property." *Id.* at 219. That observation remains true today. The Court's research did not find a single opinion from a Wisconsin state court addressing such a question. "In the absence of such direction," Judge Gordon concluded, "the court declines to allow a tort claim upon a showing of *de minimis* damage to other property." [29] *Id.* The 7th Circuit reached the same conclusion two years later in *Miller v. United States Steel Corp.*, where it held that "[i]ncidental property damage ... will not take a commercial dispute outside the economic loss doctrine." *Id.*, 902 F.2d 573, 576 (7th Cir.1990). "[T]he tail will not be allowed to wag the dog," Judge Posner explained. *Id.* Because the case was governed by Wisconsin law, Judge Posner in effect predicted the course of Wisconsin law on the issue.[30] That prediction, while not binding on a Wisconsin state court, is nevertheless binding on this Court, and in any event reflects a growing trend. In addition to Judge Gordon and the 7th Circuit, several courts from other jurisdictions have held that minimal damage to "other property" will not take a case outside the economic loss doctrine.[31]

Invoking a *de minimis* rule in this case preserves the fundamental distinction between tort and contract law. Consider the following: If wire strands frayed off the Conveyor's rope assemblies, but there was no contemporaneous or subsequent evidence that any of those strands found their way into RPC's food products, RPC could not reasonably suggest that the "other property" exception applied, despite the

---

**28.** As indicated earlier in this opinion, this number fails to take into consideration the roughly 217,000 cases of product that were destroyed in the field and never tested for contamination. The destruction of such evidence, however, occurred at RPC's direction. RPC cannot expect the Court to draw favorable inferences from non-existing evidence which was destroyed at RPC's direction. Even if the Court inferred a uniform rate of contamination to both returned and destroyed cases of product—which is the most favorable inference RPC could hope for under the circumstances—the result is only 59–60 pieces of wire within a universe of 6 million cases, or 72–144 million units, of product.

**29.** Judge Gordon's opinion does not itemize or otherwise detail the *de minimis* damage involved, except to indicate that it resulted from "several fill failures in [a] water cooling tower." *Id.* at 218.

**30.** The parties in *Miller* agreed that Wisconsin law governed the outcome of the case. *Miller*, 902 F.2d at 574.

**31.** *See e.g., Florida Power & Light Co. v. McGraw Edison Co.*, 696 F.Supp. 617, 620 (S.D.Fla.1988) (" ... to permit recovery in tort where the only property damage has been minimal damage to surrounding structures and components ... would be unjustified."); *Veeder v. NC Machinery Co.*, 720 F.Supp. 847, 853 (W.D.Wash.1989) (" ... in this case, there is only a claim for economic loss. 'Other property damage' cited by Plaintiff appears to be *de minimis* .... "); *Lewinter v. Genmar Industries, Inc.*, 26 Cal.App.4th 1214, 1223, 32 Cal.Rptr.2d 305 (Cal.App.1994) (" ... it would appear that the damaged items of personal property which were not part of the yacht's original inventory can only be classified as *de minimis.* It has been held that where the 'other property damage' appears to be *de minimis,* the essence of the claim is only for economic loss."); *State Farm Mutual Automobile Ins. Co. v. Ford Motor Co.*, 572 N.W.2d 321, 324 (Minn.App.1997) (" ... to permit a tort action based on minimal damage to 'other property,' as compared to the losses incurred from the damage to the product itself, would subvert the law.").

fact that the underlying result would most likely have been the same, i.e., RPC would still have conducted its massive recall.[32] RPC would be left to its contract remedies because the matter would be one of frustrated contractual expectations, i.e., the Conveyor did not work as expected and was not suitable for the conveyance of food products.[33] Yet, to accept RPC's economic loss argument, the discovery of a single piece of contaminated product in nearly 6 million cases of product turns this case into a tort claim, despite the fact that it probably would not add one cent to RPC's damages.[34] Such an argument, to echo Judge Posner, allows the tail to wag the dog. It blurs the essential fact that this case is more about failed commercial expectations than it is about injuries to persons or property.

The last point exposes the principle flaw in RPC's reliance on the "other property" exception and leads to an alternative basis for rejecting the same. Critical to this case is the fact that RPC was not ignorant of the risks of food contamination in its Appleton facility. Quite the contrary, such a risk was a matter of continuing concern. It necessitated the use of metal detection equipment within the plant. Subsequent concerns over the ability of that equipment to provide sufficient "tramp metal" protection prompted management to request more advanced equipment, equipment it believed would "greatly reduce exposure to the liability of product contamination in our facility." (See n. 4, supra.) Even more telling is the fact that, at the time it purchased the Floveyor Conveyor, RPC feared that metal fragments might sheer off its existing auger conveyor and contaminate food product. Indeed, that fear was a motivating factor behind buying a new conveyor system. Given these facts, it is clear that RPC was acutely aware of—indeed, partially motivated by—the risk of food contamination at the time it purchased the Floveyor Conveyor. Such facts bring this case within a "modern trend" of decisions—recently summarized by the 8th Circuit in Dakota Gasification Co. v. Pascoe Building Systems, 91 F.3d 1094 (8th Cir.1996)—which recognize an exception to the "other property" rule in cases where damage to other property "was a foreseeable result of a defect at the time the parties contractually determined their respective exposure to risk...." Id., 91 F.3d at 1099–1101 (discussing cases). In Dakota, the 8th Circuit justified this trend as a logical extension of the rationale giving rise to the "other property" rule in the first place:

> The rationale for [the 'other property' rule] is that using the economic loss doctrine to prevent tort remedies for damage to other property or to third parties is inappropriate because such damage was not within the contemplation of the contracting parties and the

---

**32.** This follows from the fact that RPC did not know in advance how much of its product was contaminated and yet concluded that a massive recall was necessary. RPC's recall was prompted by the April 2, 1994 discovery that the Conveyor's wire rope was fraying. Within a week or two prior thereto (see, Hartges Dep. at 169–171) roughly two pieces of wire were found in or around some food product, yet RPC ordered the recall of every piece of product produced at the Appleton facility from the time the Conveyor was installed, going back 11–12 months. Such a response, though drastic indeed, might be viewed as reasonable under the circumstances, given that RPC faced a serious public relations problem and the risk that a consumer might be injured by contaminated product.

Reasonable or not, that decision shows it was the possibility of food contamination that prompted the recall.

**33.** Those contractual remedies might include the right to recover consequential damages if the Court and/or the jury resolved the various issues of contract formation in RPC's favor. In that event, recall costs would come into play as a component of RPC's damages.

**34.** Of course, RPC discovered 29 pieces of contaminated product, not 1, but viewed within the context of 6 million cases of product, there is no meaningful difference between 1 piece of contaminated product and 29 pieces.

parties therefore did not fairly bargain for this additional unforeseeable risk.

\* \* \* \* \* \*

However, "[i]f such economic damage is a foreseeable consequence to the parties in a commercial relationship governed by the UCC, then it is a proper subject for negotiation and contract law, not for tort remedies."

*Id.* at 1100. A contrary ruling, the 8th Circuit concluded, would undermine one of the principle policy goals of the economic loss doctrine:

> A contrary holding would yield results that conflict with the economic loss doctrine's purpose, as recognized by the North Dakota Supreme Court in *Cooperative Power.* Allowing tort remedies in a case such as this would perversely encourage contractors to "bargain" for no warranty or insurance protection in exchange for a reduced purchase price, because they could rely on tort remedies as their "warranty." Such an outcome is plainly inconsistent with the values of commercial efficiency and predictability that drive the economic loss doctrine and that were praised in *Cooperative Power.*

*Id.* at 1100.

Wisconsin has not yet expressly joined this "modern trend." [35] That said, the *Dakota* exception to the "other property" rule is consistent with the second and third policies guiding Wisconsin's application of the economic loss doctrine. Those policies protect the parties' freedom to allocate economic risk and encourage the commercial purchaser—as the party best able to recognize and assess the foreseeable risks—to either assume the risks involved or protect itself against them through the negotiation of appropriate warranties and remedies or the purchase of insurance. Accordingly, given RPC's acute awareness of the risks of food contamination at the time it purchased the Floveyor Conveyor, it is perfectly consistent with Wisconsin's economic loss policies to expect RPC to have guarded against that risk by obtaining sufficient warranties and remedies from Kemutec. If RPC failed to do so—which may or may not be the case, depending on the end result of the Court's UCC analysis, *supra*—it is also consistent with these policies to enforce the parties' allocation of risk and preclude RPC from reneging on the same under the guise of a tort claim. In short, under the unique facts of this case, the prevention of food contamination was one of RPC's contractual expectations. If the Floveyor Conveyor failed to meet that expectation, the remedy lies in contract, not in tort.

In addition, the *Dakota* exception is consistent with Wisconsin case law on the "other property" exception. A careful review of that case law shows that when a defective product causes damage to other property in a manner that was reasonably foreseeable at the time of contracting, the damage is considered economic loss; when it causes damage in a manner that was not reasonably foreseeable, it falls within the "other property" exception. Examples of the latter principle are found in the *Northridge* and *Spychalla* cases. In *Northridge*, the Wisconsin Supreme Court con-

---

**35.** The Wisconsin Supreme Court cited *Dakota* with approval in an economic-loss case, but in a different context. *See, Daanen,* 216 Wis.2d at 408, 573 N.W.2d 842. *Daanen* confronted the question whether the economic loss doctrine precludes a commercial purchaser from recovering in tort for economic losses regardless of whether privity of contract exists between the parties. The Court concluded that it did. *See, id.* at 413, 573 N.W.2d 842. It cited *Dakota* for the principle that "allowing remote commercial purchasers to recover in tort for what is a commercial contract claim would perversely encourage those purchasers to bargain for no warranty or insurance in exchange for a reduced purchase price because they could rely on tort remedies as their 'warranty.' " *Id.* at 408, 573 N.W.2d 842. The Court did not want to create a rule that allowed commercial purchasers "to roll the dice and hope the product does not fail" and then, once it does, obtain through a tort claim the warranty they previously bargained away in exchange for a lower purchase price. *Id.* at 409, 573 N.W.2d 842. The *Dakota* rule is based on similar concerns and, in that sense, is consistent with the reasoning of *Daanen.*

cluded that asbestos contamination caused damage to "other property," *i.e.,* to the buildings within which it was incorporated. At the time of purchasing the asbestos in the early 1970's, however, the plaintiff could not have reasonably foreseen that the material would subsequently be found to cause lung problems in humans. *Northridge,* 162 Wis.2d at 924, 471 N.W.2d 179. A defect in the asbestos might have foreseeably resulted in a fire, but the purchaser could not have anticipated a remote health hazard like lung disease and therefore could not be expected to seek a warranty covering that risk. In *Spychalla,* a farmer sprayed his corn crop with a dust designed to prevent premature rotting. While the crop did not rot, it did petrify, and the jury concluded that the crop dust caused the petrification. The Wisconsin Court of Appeals acknowledged that, had the crop dust merely failed to prevent premature rotting—as opposed to petrification—the economic loss doctrine might have applied, because one could then argue that the product simply failed to perform as expected, *i.e.,* that rotting corn was a reasonably foreseeable consequence of product failure at the time of contracting. *See, Spychalla,* 151 Wis.2d at 438–39, 444 N.W.2d 743.

Contrast the rulings in *Northridge* and *Spychalla* with the ruling in *D'Huyvetter v. A.O. Smith Harvestore Products,* 164 Wis.2d 306, 475 N.W.2d 587 (Wis.App. 1991). *D'Huyvetter* is the exact flip side of *Spychalla.* In *D'Huyvetter,* a farmer purchased a grain silo for preserving and storing livestock feed. The silo was specifically designed and represented to enrich the protein content of said feed by limiting the amount of ambient air, which would in turn enhance the amount of protein passed on to the farmer's cows without the need for supplements. When the silo failed to perform as represented, the farmer sued the manufacturer for damages to the feed and livestock, asserting, *inter alia,* claims for negligence and strict liability. Though the feed and livestock were technically "other property," the Wisconsin Court of Appeals affirmed the dismissal of the negligence and strict liability claims on economic loss grounds. In doing so, the Court of Appeals cited a similar Minnesota case and *Spychalla*'s discussion of the possible distinction between a mere failure of performance and true damage to "other property:"

> Defendants contend the damage incurred by plaintiffs constituted economic loss. Whether damage to Harvestore-stored feed or to the animals consuming it is damage to "other property" has been previously considered. In *Agristor Leasing v. Guggisberg,* 617 F.Supp. 902, 908 (D.Minn.1985), applying Minnesota law, the court stated:
>
>> [We] conclude[ ] as a matter of law that the alleged damage to the alfalfa feed and Holstein cows is nonrecoverable economic loss. The Harvestore structure in question was purchased for the purpose of storing feed for the Guggisbergs' dairy operation, a commercial venture. The essence of their complaint is that the Harvestore failed to perform as expected, and they seek to recover the resulting losses to their dairy farm, the loss of the benefit of their bargain. Under such circumstances, the court concludes, as a matter of law, that the Guggisbergs' alleged damage is an economic loss which is not exempted by the "other property" language of *Superwood [Corp. v. Siempelkamp Corp.,* 311 N.W.2d 159 (Minn.1981), overruled, *Hapka v. Paquin Farms,* 458 N.W.2d 683 (Minn.1990) ].
>
> We find this reasoning persuasive. The expected function of the Harvestore was to enrich the feed, providing enhanced nutrition for the cows. The damages stem from the failure of the Harvestore to perform "as expected," *Spychalla,* 151 Wis.2d at 438, 444 N.W.2d at 747, and not from "injury to another person or property." *Id.*

*D'Huyvetter,* 164 Wis.2d at 327–28, 475 N.W.2d 587. Thus, because damage to the feed and to the livestock were reasonably

foreseeable consequences of a defect in the silo, they did not constitute damage to "other property."

 Accordingly, whether by way of invoking a *de minimis* exception to the "other property" rule, or by predicting Wisconsin's adoption of the *Dakota* exception to the same, the Court concludes that the contamination of RPC's food product does not take this case outside the economic loss doctrine. The small amount of contamination at issue, plus the fact that such contamination was a known risk which purchase of the Conveyor was intended to prevent, establishes this case as one of frustrated commercial expectations "more akin to economic loss [than] physical harm to property." *Raytheon,* 979 F.Supp. at 867 (quoting, *Northridge,* 162 Wis.2d at 937, 471 N.W.2d 179). The Court cautions, however, that its prediction regarding Wisconsin's adoption of the *Dakota* exception not be read too broadly. Many risks may be foreseeable in a remote or general sense. The *Dakota* exception requires something more. As the Court views it, the *Dakota* exception requires evidence that prevention of the subject risk was one of the contractual expectations motivating the purchase of the defective product. That standard is satisfied here. Food contamination was a continuing and important concern at RPC's Appleton facility. RPC was in the market for a new conveyor precisely because it feared the existing conveyor might contaminate food product with metal fragments. To this end, RPC specifically questioned whether the Floveyor Conveyor was suitable for food applications prior to purchasing the same. These unique facts demonstrate that prevention of food contamination was one of the contractual expectations motivating RPC's purchase.

### b. Public Safety Exception

The second question is whether this case might fit within a narrow "public safety" exception to the economic loss doctrine. What makes application of the economic loss doctrine somewhat uncomfortable in this case is that the alleged defect in the Floveyor Conveyor created a public health hazard. It is generally stated that "defects of suitability and quality are redressed through contract actions and safety hazards through tort actions." *Northridge,* 162 Wis.2d at 934, 471 N.W.2d 179. Indeed, in the *Northridge* decision, the Wisconsin Supreme Court found the economic loss doctrine inapplicable to an asbestos case precisely because the presence of asbestos in the affected buildings created a public health hazard best addressed by the risk-sharing principles of tort law. *Id.* at 937–38, 471 N.W.2d 179. Why should this case be treated differently?

The Court confronted a similar problem in its *Raytheon* decision. In *Raytheon* the plaintiff purchased a piece of industrial property which was later found to be contaminated by hazardous waste. Plaintiff commenced a CERCLA action against the seller of the property seeking reimbursement for the costs of removing the hazardous waste. Plaintiff joined several state law claims to its federal claims, including various tort claims. Defendant moved to dismiss the tort claims under the economic loss doctrine. The Court noted the difficulty of categorizing the case for economic loss purposes:

> Cases such as this ... are not easily categorized for purposes of the economic loss doctrine. It is a hybrid of sorts. On the one hand, Raytheon purchased a parcel of land which later proved to have a defect, *i.e.,* it was contaminated. It incurred costs in an effort to repair the defect and obtain the benefit of its bargain. No costs were incurred for injuries or damage to persons or property other than the land itself. In this sense, the case seeks damages for frustrated contractual expectations. On the other hand, the only reason the contamination had to be removed was because the law deems the same a threat to public health and the environment. Absent such a threat, and such laws, Raytheon had no obligation or need to clean up the site.

In this sense, the case seeks damages for a safety hazard.

*Raytheon,* 979 F.Supp. at 867.

The Court, taking its direction from *Northridge,* resolved its dilemma by "determin[ing] whether the damages the plaintiffs allege are more akin to economic loss or physical harm to property." *Id.* In this regard the Court noted that, while the contaminated land posed a threat of harm to the public, there was no allegation that the contamination actually resulted in any of the threatened harm. *Id.* at 868. The Court concluded that "the mere risk of harm to the public ... is not sufficient to transpose Raytheon's economic losses into tort damages." *Id.* As recently noted by the Wisconsin Supreme Court, the United States Supreme Court reached a similar conclusion in *East River Steamship Corp. v. Transamerica Delaval, Inc.,* 476 U.S. 858, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986), where the federal high court "held that it would be 'unsatisfactory' to condition the availability of a tort action on the degree of risk which a defective product might pose to persons or property." *Wausau Tile, Inc. v. County Concrete Corp.,* 226 Wis.2d 235, 593 N.W.2d 445, 458 n. 17 (1999) (quoting, *East River,* 476 U.S. at 870, 106 S.Ct. 2295).

■ Given *Raytheon* and *East River,* the Court reaches the same conclusion here. The contaminated food involved in this case could have injured a number of consumers. Happily, it did not. Absent such an injury, the threat remained only a threat. Tort law has always been injury driven. Society has never created tort liability for close calls, at least not with respect to generalized threats to the public at large. Moreover, from a policy perspective, society need not create tort liability for mere threats to the public health in order to adequately protect itself from un-

reasonable dangers. " 'Since any product put into the stream of commerce has the theoretical potential to injure persons and property, the incentive to provide safe products is always present.'" *General Casualty Co. of Wisconsin v. Ford Motor Co.,* 225 Wis.2d 353, 592 N.W.2d 198, 201 (1999) (citing, Christopher Scott D'Angelo, *The Economic Loss Doctrine: Saving Contract Warranty Law from Drowning in a Sea of Torts,* 26 U. Toledo L.Rev. 591, 602 (1995) (quoting, *Bocre Leasing Corp. v. General Motors Corp.,* 84 N.Y.2d 685, 691, 621 N.Y.S.2d 497, 645 N.E.2d 1195 (N.Y. 1995))). "Safety concerns are adequately protected by holding manufacturers liable for personal injury and damage to other property," not for mere threats of the same. *General Casualty,* 592 N.W.2d at 200–201 (citing D'Angelo, 26 U. Toledo L.Rev. at 602).

The Wisconsin Supreme Court's decision in *Northridge* does not require a different result. To the extent *Northridge* created a "public safety" exception to the economic loss doctrine—a debatable proposition itself [36]—the Supreme Court's subsequent decision in *Wausau Tile* expressly limited that exception to the unique fact situation presented by asbestos and other materials that are "inherently dangerous to the health and safety of humans." *Wausau Tile,* 593 N.W.2d at 458–59. Industrial food conveyors are not inherently dangerous to the health and safety of humans. Given their prevalence in the food industry, one may assume that they work in a generally safe and reliable manner. Something must go wrong with such a machine before it presents a threat to the public health, and even then the threat may never materialize. In short, the Floveyor Conveyor is not the type of product the *Northridge* decision was intended

---

36. As stated in *Wausau Tile,*

[t]he certified question [*i.e.,* the nature, extent and scope of the public safety exception to the economic loss doctrine enunciated in *Northridge* ] in itself may reflect a misunderstanding. Strictly speaking, *Northridge* did not address whether the risk to

safety alone created an exception to the economic loss rule because *Northridge* concluded that the plaintiff alleged damage to "other property" in the form of asbestos contamination of the plaintiff's building.

*Wausau Tile,* 593 N.W.2d at 458 n. 17.

to reach. To the extent that Wisconsin recognizes a "public safety" exception to the economic loss rule, it does not apply to this case.

### c. Misrepresentation Claims

The final question for economic loss purposes is whether the economic loss doctrine precludes RPC's misrepresentation claims, particularly its claim for intentional misrepresentation. The Court discussed this issue in some depth in its *Raytheon* decision. *See, Raytheon,* 979 F.Supp. at 870–73. The Court noted that no Wisconsin court had addressed the issue and predicted that Wisconsin would follow a growing trend—led in part by a Michigan appellate court decision, *Huron Tool and Engineering Co. v. Precision Consulting Services, Inc.,* 209 Mich.App. 365, 532 N.W.2d 541 (1995)—which "recognizes a limited exception to the economic loss doctrine for fraud claims, but only where the claims at issue arise independent of the underlying contract." *Id.* at 870. This trend is sometimes referred to as the *Huron* limitation on the fraud-in-the-inducement exception to the economic loss doctrine. *See, Budgetel Inns, Inc. v. Micros Systems, Inc.,* 8 F.Supp.2d 1137, 1146 (E.D.Wis.1998) (*Budgetel I* ). It allows plaintiffs to plead tort claims stemming from misrepresentations which induce them to enter into a contract, so long as the representations are extraneous to the contract itself. *Id.* at 871. Misrepresentations are "extraneous to the contract" when they do not concern the quality or characteristics of the subject matter of the contract or otherwise relate to the offending party's expected performance of the contract. *Id.* (quoting, *Huron,* 532 N.W.2d at 545–46). For example, in *Raytheon,* the alleged misrepresentations simply mirrored or repeated the warranties found in the underlying contract. In *Huron,* the alleged misrepresentations concerned the quality and characteristics of software forming the subject matter of the underlying contract. In both cases, the economic loss doctrine barred the asserted fraud claims because the underlying misrepre-

sentations were not extraneous to the contract.

The misrepresentations alleged in this case are drawn from the ads and brochures which Sage reviewed prior to purchasing the Floveyor Conveyor, his conversations with Hajek of AID, and the quote he received from Hajek. These materials and conversations include representations that the Floveyor Conveyor: (1) could "handle" or "move[ ] mountains of almost anything," including "food," "fine powders," "food powders" and "bakeries;" (2) was suitable for use in the bakery industry and had "excellent experience in handling bakery materials and products;" (3) had a good track record; and (4) would be suitable for RPC's particular application and requirements. Clearly, all of these representations relate to the quality, characteristics and performance of the Floveyor Conveyor. They mirror the warranties of merchantability and fitness for a particular purpose which—as the Court concluded *supra* —became part of the contract as supplementary terms under the UCC. RPC fails to submit evidence of a single representation extraneous to the terms or conditions of the contract which induced it to enter the agreement with Kemutec.

Accordingly, consistent with the Court's decision in *Raytheon,* RPC's misrepresentation claims are barred by the economic loss doctrine. This includes RPC's claim for intentional misrepresentation. The latter conclusion is a matter of some dispute within the Eastern District of Wisconsin. Judges Reynolds and Stadtmueller each issued decisions consistent with the *Huron* limitation, concluding that the economic loss doctrine applies to claims of intentional misrepresentation if the representations at issue are not extraneous to the contract. *See, Budgetel Inns, Inc. v. Micros Systems, Inc.,* 34 F.Supp.2d 720, 721–22 (E.D.Wis.1999) (*Budgetel II* ) (discussing, *Ice Bowl, L.L.C. v. Weigel Broadcasting Co.,* 14 F.Supp.2d 1080 (E.D.Wis.1998)(Reynolds, J., presid-

ing) and *Home Valu, Inc. v. Pep Boys—Manny, Moe & Jack of Del, Inc.*, No. 98–C–531 (E.D.Wis. Dec. 23, 1998)(Stadtmueller, J., presiding)). Judge Adelman, however, issued two decisions disagreeing with the *Huron* limitation. *See, Budgetel I* and *II, supra.* The split of authority carries over to the Western District of Wisconsin. Judge Crabb, pre-*Raytheon*, issued a decision carving out an exception to the economic loss doctrine for claims of intentional misrepresentation, *see, Stoughton Trailers, Inc. v. Henkel Corp.*, 965 F.Supp. 1227 (W.D.Wis.1997), and Judge Shabaz, post-*Raytheon*, reached a contrary conclusion consistent with *Huron* and *Raytheon. See, Weather Shield Mfg., Inc. v. PPG Industries, Inc.*, 1998 WL 469913 (W.D.Wis.1998). Even the Wisconsin Courts of Appeals appear to be splitting on the matter. In an unpublished decision entitled *Thurin v. A.O. Smith Harvestore Products, Inc.*, 221 Wis.2d 220, 584 N.W.2d 233, 1998 WL 378840 * 16–17 (Wis.App.1998), District IV held that claims for intentional misrepresentation based upon statements concerning "the quality or character of the goods sold" are barred by the economic loss doctrine.[37] However, in a published decision entitled *Douglas–Hanson Co., Inc. v. BF Goodrich Co.*, 229 Wis.2d 132, 598 N.W.2d 262 (Wis.App.1999), District III seemed to adopt the contrary conclusion reached in *Budgetel I* and *II.*

Obviously, reasonable minds differ on the issue. Predicting the course of Wisconsin law under such circumstances is difficult. As the Court noted in *Raytheon*, it is made easier by the fact that the 7th Circuit addressed the issue in *Cooper Power Systems, Inc. v. Union Carbide Chemicals & Plastics Co., Inc.*, 123 F.3d 675 (7th Cir.1997). In *Cooper Power*, the 7th Circuit predicted that the Wisconsin Supreme

Court would apply the economic loss doctrine to claims of intentional misrepresentation based on statements relating to product quality:

> Cooper's final argument to escape the confines of commercial law is to assert that its misrepresentation claims, though arising in tort, are an exception to the economic loss doctrine. This court, however, has already predicted that Wisconsin would not allow a negligence or strict liability misrepresentation claim seeking to recover economic damages. We perceive no basis for treating Cooper's intentional misrepresentation claim any differently. Cooper's misrepresentation claims assert that Carbide misrepresented the properties (or failed to speak when it had a duty to do so) of VYES to PFI, which in turn was unable to keep Cooper abreast of potential problems with Weathercote–T. Misrepresentations such as these, that ultimately concern the quality of the product sold, are properly remedied through claims for breach of warranty. Cooper could have and maybe did (its claims against PFI are still pending) extract an express warranty from PFI to remedy any misrepresentations related to product quality. A perfectly workable commercial chain therefore exists for recovery: Cooper sues PFI using commercial law for claims relating to the sale of Weathercote–T, and PFI sues Carbide using the same set of principles for claims relating to the sale of VYES. "The insight behind the [economic loss] doctrine is that commercial disputes ought to be resolved according to the principles of commercial law rather than according to tort principles...."

*Cooper Power*, 123 F.3d at 682.

The Court considers *Cooper Power's* prediction of Wisconsin law binding.[38]

**37.** Under Wisconsin law, unpublished decisions may be cited to demonstrate a conflict between two court of appeals' districts. *See, State v. Higginbotham*, 162 Wis.2d 978, 996–98, 471 N.W.2d 24 (Wis.1991).

**38.** As does Judge Shabaz of the Western District. He held that "[t]he distinction between intentional and unintentional misrepresentation applied in *Stoughton Trailers* ... is not viable in light of *Cooper's* express rejection of this distinction." *Weather Shield*, 1998 WL 469913 at *5.

*Budgetel I* distinguished *Cooper Power* on grounds that "the Seventh Circuit [has not] addressed whether fraud in the inducement is an exception to *Cooper*'s holding that intentional misrepresentation claims are barred." *Budgetel I*, 8 F.Supp.2d at 1144. However, *Cooper Power* did not hold that intentional misrepresentation claims are barred by the economic loss doctrine. *Cooper Power* held that such claims are barred *if they are based on representations regarding product quality*. That holding is the sum and substance of the fraud-in-the-inducement exception developed in *Huron* and recognized by this Court in *Raytheon*.[39] Failure to use the label *fraud in the inducement* does not alter the nature or content of the holding in *Cooper Power*. The 7th Circuit's holding was not tied to the timing of the underlying representations. Regardless of whether the representations induced the plaintiff to enter a contract, *Cooper Power* holds they are not actionable in tort if they relate to the quality or properties of the subject matter of the contract. That holding is binding on this Court and requires the dismissal of RPC's intentional misrepresentation claim.

*Budgetel I* and *II* raised certain concerns about the *Huron* limitation. First, it was suggested that "[i]n practice, the Huron limitation renders the fraud in the inducement exception a nullity." *Budgetel I*, 8 F.Supp.2d at 1146. This concern stems from the observation that every case applying the *Huron* limitation—at least those "cited by the parties and researched by the court" in *Budgetel I*—dismissed the underlying fraud in the inducement claim. *Id.* That is to be expected of an *exception*. Fraud in the inducement is an exception which, by definition, applies to only a narrow range of cases. Despite this, the *Huron* limitation is not so stingy that its use is practically non-existent. It is not difficult to conceive of several scenarios giving rise to claims for fraud in the inducement that survive a

challenge under *Huron*. For example, a company might falsely misrepresent its financial condition, or the level of its insurance coverage, in order to induce another company to enter into a contract. Such considerations, while they may be relevant when considering who to do business with, do not concern the underlying subject matter of the contract or a party's performance thereunder. Another example is representations regarding organizational form and status. A company may represent itself as a non-profit, charitable organization in order to induce another company to do business on terms more favorable than would otherwise be the case. Or someone doing business as a corporation may represent themselves as a sole proprietorship or partnership, inducing another party to do business thinking they have recourse against personal assets should a dispute develop. Such representations have nothing to do with the subject matter of the underlying contracts or the offending party's performance thereunder, yet they may inflict damages upon the party that relies on them when deciding whether or not to do business. The *Huron* limitation may set the bar high, but it is not the death knell of fraud in the inducement claims between contracting parties.

Second, while *Budgetel I* views the *Huron* limitation as rendering fraud in the inducement a nullity, the alternative is a rule which appears to render the economic loss doctrine a nullity. If, as *Budgetel I* states, all claims for fraud in the inducement are extraneous or independent of the contract because they occur "prior to the formation of the contract itself . . .," *Id.* at 1147, every breach of warranty claim could be turned into a tort by a simple affidavit stating, in effect, that the warranty was spoken before it was written. Worse, written disclaimers of warranties could be voided after the fact by the same affidavit, again so long as the oral representations preceded the contract. As *Ice Bowl*

---

**39.** In fact, *Cooper Power* cited *Huron* as nonbinding authority in this regard. *Cooper Power*, 123 F.3d at 682 n. 4.

warns, allowing one party to plead a tort claim based on oral representations by another concerning the performance of obligations which are also contained in a written contract "would swallow the economic loss doctrine." *Ice Bowl,* 14 F.Supp.2d at 1083 (quoting, *Cooper Power,* 123 F.3d at 681–82). Moreover, as recently reiterated by the 7th Circuit, such a rule scuttles the virtue of predictability in commercial transactions and makes it impossible for a seller of goods to be certain he effectively disclaimed a warranty:

> Where there are well-developed contractual remedies, such as the remedies that the Uniform Commercial Code (in force in all U.S. states) provides for breach of warranty of the quality, fitness, or specifications of goods, there is no need to provide tort remedies for misrepresentation. The tort remedies would duplicate the contract remedies, adding unnecessary complexity to the law. Worse, the provision of these duplicative tort remedies would undermine contract law. That law has been shaped by a tension between a policy of making the jury the normal · body for resolving factual disputes and the desire of parties to contracts to be able to rely on the written word and not be exposed to the unpredictable reactions of lay factfinders to witnesses who testify that the contract means something different from what it says.
>
> \* \* \* \* \* \*
>
> The function of the economic-loss doctrine in confining contract parties to their contractual remedies is particularly well illustrated by cases involving product warranties, such as our *Cooper Power Systems* case. If the seller makes an oral representation that is important to the buyer, the latter has only to insist that the seller embody that representation in a written warranty. The warranty will protect the buyer, who will have an adequate remedy under the Uniform Commercial Code if the seller reneges. To allow him to use tort law in effect to enforce an oral warranty would unsettle contracts by exposing sellers to the risk

of being held liable by a jury on the basis of self-interested oral testimony and perhaps made to pay punitive as well as compensatory damages. This menace is averted by channeling disputes into warranty (contract) law, where oral warranties can be expressly disclaimed, or extinguished by operation of the parol evidence rule.

*All–Tech Telecom, Inc. v. Amway Corporation,* 174 F.3d 862, 865, 866 (7th Cir. 1999).

Finally, as for *Budgetel I'*s concern that lies chill the bargaining process and have a deleterious effect on the free allocation of risk by the parties, *see, Budgetel I,* 8 F.Supp.2d at 1147–48, the answer is found in warranties. Warranties of merchantability and fitness for a particular purpose are common hedges against the carelessness or outright dishonesty of a party's representations regarding the subject matter of a contract. If a seller insists on disclaiming such warranties, only the most obtuse of buyers continues to rely on oral representations to the contrary. That is particularly true in cases like this, where both the seller and the buyer are sophisticated commercial entities dealing at arms length and with relatively equal bargaining strength. In the final analysis, the underlying lesson and purpose of the economic loss doctrine is that if statements are made concerning the subject matter of the contract, get them in writing (in warranty form or otherwise) and obviate the need for a factfinder to write the contract after the fact.

Accordingly, RPC's motion for partial summary judgment is denied with respect to Kemutec's economic loss defense. Kemutec's motion for summary judgment is granted with respect to RPC's tort claims, which are hereby dismissed.

### 3. The Laches Defenses

█ Kemutec also argues that RPC failed to notify it of the claimed defect within the time required under the contract and/or the Uniform Commercial

Code ("UCC"), and also failed to start this action within the time allowed by the applicable statute of limitations. Not so. Kemutec's argument regarding contractual notice assumes that its standard terms and conditions governed this transaction, an assumption rejected by the Court in its UCC analysis, *supra.* As for the UCC, it only requires notice within a reasonable time. *See,* Wis.Stat. § 402.607(3)(a). RPC notified Kemutec of the problem eight days after discovering the same, which is certainly reasonable. And Kemutec seems to abandon its statute of limitations defense, as it offers no rebuttal to RPC's argument that a six-year statute of limitations controls the contract claims that remain in this case, which period was complied with here. Accordingly, RPC's motion for partial summary judgment is granted with respect to Kemutec's laches defenses, which are hereby dismissed.

### B. Kemutec's Motion for Summary Judgment

The Court's decision on RPC's motion for partial summary judgment narrows significantly the Court's analysis of Kemutec's counter motion for summary judgment. So narrowed, Kemutec's motion raises the following issues: Do RPC's settlements with Floveyor and AID result in a complete discharge of Kemutec as well ("the circle of indemnification defense"); (2) does RPC have a viable claim under § 349 of the New York General Business Law; (3) does RPC have a breach of contract claim separate from its breach of warranty claims; (4) is RPC solely responsible for the massive recall costs involved in this case. The Court addresses each issue in turn.

### 1. The Circle of Indemnification Defense

■■ Indemnification is a vehicle by which one party or defendant to a lawsuit attempts to shift the entire responsibility for a loss or injury to another party. The right to indemnification arises either by an express contractual provision or, in some situations, by an implied right of indemnity

based on equitable principles. Kemutec's claim to indemnification in this case is principally based on an implied or equitable right to indemnity. First, Kemutec argues that Floveyor was solely responsible for the design, manufacture and marketing of the Floveyor Conveyor, and that Kemutec simply sold the Conveyor to RPC based on representations and marketing materials created by Floveyor and given to Kemutec for that express purpose. As such, Kemutec argues that equitable principles require Floveyor to bear sole responsibility for the injuries suffered by RPC. Second, to the extent AID made representations to RPC which went beyond those created by Floveyor and passed on by Kemutec, such representations were unauthorized and unratified by Kemutec and equitable principles require AID to bear sole responsibility for any damages flowing therefrom. Third, given that either Floveyor or AID, or a combination of both, must indemnify Kemutec in full, and that RPC's settlement agreements with both parties provide that RPC will hold them harmless and assume all liability for any indemnification claims which Kemutec might assert against them, Kemutec argues that RPC created a circle of indemnification which effectively discharges Kemutec from all possible liability. The Court disagrees.

■ First, the Court has already concluded that there were no representations made by either Kemutec or AID which went beyond the warranties and descriptions of the Conveyor contained in the underlying contract between Kemutec and RPC. Accordingly, AID did not make any representations to RPC which went beyond those created by Floveyor and passed on or ratified by Kemutec, and thus there is no factual basis for Kemutec's claim of indemnity against AID.

■ Second, it is undisputed that there was an express indemnity provision contained in the EDA between Floveyor and Kemutec. "Recovery under a contract providing for indemnity obviates any right

to recovery under the common law theory of implied indemnity since by such an express contract the parties have already themselves determined how and under what circumstances losses shall be allocated." *Carroll v. Acme–Cleveland Corp.*, 955 F.2d 1107, 1113 (7th Cir.1992) (quoting with approval, *Quilico v. Union Oil Co. of California*, 58 Ill.App.3d 87, 15 Ill.Dec. 784, 374 N.E.2d 219, 226 (1978)); *see also*, *Northwestern National Ins. Co. of Milwaukee, Wisconsin v. Lutz*, 71 F.3d 671, 677 (7th Cir.1995); *Commercial Insurance Co. of Newark v. Pacific–Peru Construction Corp.*, 558 F.2d 948, 953 (9th Cir. 1977). Thus, Kemutec is left to its contractual indemnity rights, rights which cannot be determined on the current record. First, the interpretation of that provision is governed by English law, and neither RPC nor Kemutec provide the Court with analysis of the relevant principles of English law. Moreover, there are factual issues concerning whether RPC's damages were the result of a defect in the Floveyor itself or a "faulty application" which was not "specifically recommended or warranted in writing by Floveyor;" under the EDA, Floveyor indemnifies Kemutec for the former, but Kemutec indemnifies Floveyor for the latter. Finally, Floveyor's exposure under the indemnification provision is limited to $3 million, and the damages claimed by RPC exceed that figure by several million dollars. Thus, even if the indemnification applies, Kemutec may only be partially discharged from liability.

Accordingly, Kemutec's motion for summary judgment is denied with respect to Kemutec's circle of indemnification defense.

### 2. Section 349

■■■ RPC asserts a cause of action under § 349 of the New York General Business Law, which prohibits "deceptive acts or practices in the conduct of any business, trade, or commerce or in the furnishing of any service in this state." There are two reasons why such a claim is not viable on the facts of this case. First,

there is no evidence that Kemutec—located in Pennsylvania—committed any deceptive acts or practices against RPC in New York. *See, Nardella v. Braff*, 621 F.Supp. 1170, 1172–73 (S.D.N.Y.1985). To the contrary, Kemutec dealt at all times in this transaction with AID—an Illinois distributor—and RPC's facility in Appleton, Wisconsin. Second, § 349 only applies to ordinary or recurring consumer transactions affecting the public at large. *See, Genesco Entertainment v. Koch*, 593 F.Supp. 743, 751–52 (S.D.N.Y.1984); *Graham v. Eagle Distributing Co., Inc.*, 224 A.D.2d 921, 637 N.Y.S.2d 583, 583–84 (1996). It does not apply to private transactions between commercial entities which affect only the two parties to the contract, which is the case here. *Id.* Accordingly, Kemutec's motion for summary judgment is granted with respect to RPC's claim under § 349 of the General Business Law of New York.

### 3. Breach of Contract Claim

■■■ RPC's first cause of action alleges that Kemutec "breached their agreement *** to sell to RPC a Floveyor Conveyor which was capable of performing in accordance with the aforementioned warranties and representations...." RPC's second and third cause of action, which plead claims for breach of express and implied warranties, are based on the exact same "warranties and representations" as the breach of contract action. Kemutec argues therefrom that the breach of contract claim is redundant and should be dismissed or stricken. RPC argues that it is allowed to plead alternative theories on the same facts and cites cases denying motions to dismiss or strike so-called duplicative or redundant claims. The cases cited, however, dealt with motions filed early in a lawsuit and/or concerned claims which might prove factually distinct down the road. *See, Fink v. DeClassis*, 745 F.Supp. 509, 515 (N.D.Ill.1990); *Limousine Werks, Inc. v. Flaherty Mfg., Inc.*, 1989 WL 8553 (N.D.Ill.1989); *Consolidated Edison Co. of New York, Inc. v. Westinghouse Elec. Corp.*, 567 F.Supp. 358, 369 (S.D.N.Y.

1983); *Maryland Staffing Services, Inc. v. Manpower, Inc.*, 936 F.Supp. 1494, 1508–09 (E.D.Wis.1996). Here, the suit is close to trial, and RPC offers no argument that the breach of contract claim is somehow factually distinct from the breach of warranty claims. Accordingly, to further clarify and narrow the relevant issues for trial and avoid jury confusion, Kemutec's motion for summary judgment is granted with respect to RPC's breach of contract claim.

### 4. Recall Costs

■■■ Kemutec's argument with respect to who bears responsibility for the massive recall costs incurred in this case raise factual issues that the Court cannot decide on summary judgment. Whether such costs were proximately caused by the alleged defect in the Floveyor Conveyor or, as Kemutec argues, by RPC's failure to maintain proper metal detection equipment, maintain proper inspection records, etc., is a question the jury must decide. The same can be said for the question of whether the recall costs involved were so disproportionate to the size of the commercial transaction as to be unforeseeable at the time of the transaction. Accordingly, Kemutec's motion for summary judgment is denied with respect to its claim regarding RPC's responsibility for the recall costs.

### C. Kemutec's Motion to Amend and RPC's Motion for a Bar Order

■■■ Kemutec moves to amend the scheduling order in order to permit it to file third party claims for indemnification against Floveyor and Aid. RPC, in turn, moves the Court for an order barring any such claims by virtue of the *Pierringer* releases contained in RPC's settlement agreements with Floveyor and AID. The Court's dismissal of the tort claims on economic loss grounds simplifies the issues surrounding these two motions. That is, the underlying settlement agreements with Floveyor and AID expressly grant *Pierringer* releases only with respect to the unintentional tort claims. General releas-

es are granted with respect to any other claims in the lawsuit. Thus, the *Pierringer* releases do not preclude Kemutec from asserting indemnification claims stemming from the breach of warranty claims remaining against it. Accordingly, RPC's motion for a bar order is denied.

Of course, the Court has already concluded that Kemutec has no indemnification claim vis-a-vis AID, and that it has only a contractual indemnification claim against Floveyor in the amount of $3 million dollars. Accordingly, Kemutec's motion to amend is granted, but only for purposes of asserting a contractual indemnification against Floveyor, who may be brought back into this suit for that purpose. Ultimately, RPC may have to defend and hold Floveyor harmless against Kemutec's indemnification claim, but the same does not preclude Kemutec from rejoining Floveyor as a party.

### D. Kemutec's Motion to Compel Discovery

■■■ Kemutec moves the Court for an order compelling RPC to produce documents responsive to Kemutec's Sixth Request for Production of Documents concerning information RPC received about Floveyor and other aero-mechanical conveyors prior to April 20, 1994. Kemutec argues that such information is relevant to the issue of whether RPC was aware of the maintenance requirements for such conveyors, including the procedures for tensioning the wire rope assembly, which is relevant in turn to the issue of whether the damages suffered by RPC were a result of improper maintenance and tensioning or a defect in the Conveyor itself. The Court agrees. The fact that such discovery comes late in the game is irrelevant. The requests were made prior to the discovery deadline and seek material which is clearly discoverable. Accordingly, Kemutec's motion to compel is granted and RPC is hereby ordered to produce the documents responsive to Kemutec's Sixth Re-

quest for Production of Documents within thirty (30) days of the date of this Order.

Kemutec also moves the Court to allow it to conduct any supplemental discovery necessitated by what it learns from the documents provided by RPC in response to the Court's order to compel. Said request is granted, although RPC will be free to move for a protective order with respect to any discovery which is not reasonably supplementary to such information.

### E. RPC's Motion to Amend

RPC moves to amend the scheduling order to permit it to file an amended complaint naming Kemutec's insurer—Zurich Insurance Company ("Zurich")—as a defendant pursuant to Wisconsin's direct action statute. RPC particularly asks that its request be granted if the Court grants Kemutec's motion to amend the scheduling to join Floveyor or AID and/or if the August 2, 1999 trial date is removed from the Court's calendar. The latter occurred, and Kemutec is being allowed to join Floveyor for purposes of a contractual indemnification claim. Kemutec does not object to RPC's motion. Zurich objects on grounds that the request comes after the deadline for amending the complaint and will prejudice Zurich's ability to resolve the coverage dispute prior to the new trial date of March, 2000. RPC claims that the timing of its request is the result of Kemutec's deliberate misrepresentations of the amount of coverage available for RPC's claims herein. Specifically, Kemutec disclosed the relevant policy limits, but never disclosed that Zurich asserted coverage defenses that could result in a complete denial of coverage. RPC claims that, had it known of Zurich's coverage defenses, it would have joined Zurich immediately, and also would never have settled with Floveyor. The latter settlement, RPC argues, was motivated in part by RPC's belief that Kemutec was a deep pocket by virtue of a $13 million insurance policy.

First, the Court finds RPC's claim that Kemutec deliberately misrepresented its insurance situation to be wholly without merit. Kemutec's answers to mandatory discovery identified Zurich as its insurer and set forth "the amount of liability coverage provided in each policy,...." Local Rule § 7.07(a)(2)(vi). That is all the rule on mandatory discovery requires. It does not require a defendant to state whether or not its insurer has asserted any coverage defenses. RPC simply read too much into Kemutec's straightforward response to mandatory interrogatories. Moreover, RPC never submitted a formal discovery request upon Kemutec for such information, or if it did, it never moved to compel such information when it was not forthcoming. RPC served Zurich with a subpoena for its records in July of 1997, but again failed to move to compel such information when Zurich refused to comply, asserting the work product privilege. Accordingly, while it appears Kemutec and Zurich were not going to produce such information until forced by a court order, RPC failed to seek such an order, and that is entirely its own fault.

Second, the standard for amending the complaint at this juncture is the liberal "good cause" standard of Fed.R.Civ.P. 15. "Excusable neglect" does not apply because the deadline for amendments contained in the Court's scheduling order simply extends the time by which a party may amend its pleadings as a matter of course. It does not place a deadline upon Rule 15 requests for leave to amend. Here, good cause is met by the fact that the August, 1999 trial has gone by the boards and the new trial date for March of 2000 leaves ample time to address any coverage issues herein. Moreover, the Court granted Kemutec's 11th hour motion, *supra*, to amend the scheduling order to assert a contractual indemnification claim against Floveyor. Fairness requires that RPC be extended the same courtesy.

Accordingly, RPC's motion to amend the scheduling order is granted and RPC may amend its complaint to add a claim against Zurich under Wisconsin's direct action statute.

### F. RPC's Motion for Reconsideration

Finally, RPC moves the Court to reconsider its Decision and Order dated June 24, 1999 denying RPC's motion to take supplemental depositions. RPC's arguments do not alter the Court's initial view of the motion. For the reasons stated in its prior decision, the Court denies RPC's motion for reconsideration.

**NOW THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT:**

1. RPC's motion for partial summary judgment is granted-in-part and denied-in-part, consistent with the foregoing opinion;

2. Kemutec's motion for summary judgment is granted-in-part and denied-in-part, consistent with the foregoing opinion;

3. RPC's motion for a bar order is denied;

4. Kemutec's motion to amend the scheduling order is granted-in-part and denied-in-part, consistent with the foregoing opinion;

5. Kemutec's motion to compel is granted;

6. RPC's motion to amend the scheduling order is granted; and

7. RPC's motion for reconsideration is denied.

**SO ORDERED.**